**Ron YOUNG, et al., Plaintiffs,**

v.

**Oscar BALLIS, Jr., et al., Defendants.**

**No. EV 90–90–C.**

United States District Court,
S.D. Indiana,
Evansville Division.

Dec. 7, 1990.

---

Richard A. Waples, ICLU, Indianapolis, Ind. and John Emry, Franklin, Ind., for plaintiffs.

James A. McEntarfer, Zoercher Huber & McEntarfer, Tell City, Ind. and Michael R. Morow, Stephenson and Kurnik, Indianapolis, Ind., for defendants.

## MEMORANDUM

BROOKS, Chief Judge.

## I. INTRODUCTION TO CASE

This action was initiated on August 20, 1990 by the filing of a Class Action Complaint for Declaratory and Injunctive Relief. Plaintiffs filed an Amended Complaint seeking declaratory, injunctive, and money damages relief on September 7, 1990. In short, plaintiffs contend that the conditions of the Perry County, Indiana jail are violative of the Fourteenth and Eighth Amendments to the United States Constitution. The case is brought under 42 U.S.C. § 1983.

On September 10, 1990 plaintiffs filed a Motion for Preliminary Injunction. An evidentiary hearing was conducted on the Motion for Preliminary Injunction on September 25, 1990. During that hearing the parties jointly requested that the Court visit the jail. The Court conducted an unannounced inspection of the jail on November 2, 1990. The Court's findings of fact and conclusions of law are as follows:

## II. PRELIMINARY INJUNCTION STANDARD

■ F.R.Civ.P. 65 provides for preliminary injunctions. "Defined broadly, a preliminary injunction is an injunction that is issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11 Wright and Miller § 2947, p. 423 (1973).

The standard for determining whether a preliminary injunction should be issued is well established in the Seventh Circuit. The methodology that this Court is to apply is found in *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir. 1984).

First, the movants must show that there is no adequate remedy at law. Second, that they will suffer irreparable harm if the injunction is not granted. Third, the movants must show some likelihood of success on the merits. Initially, this requirement is low; the plaintiffs need only prove that their "chances are better than negligible." *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982).

■ These three showings act as a threshold. If the plaintiffs do not meet this test the preliminary injunction is not to be issued. If the plaintiffs establish that there is no adequate remedy at law, that they will be irreparably harmed absent the requested injunction, and that they have at least a better than negligible chance of succeeding on the merits at trial, then the court must "assess the probability that each party will prevail on the merits and harm of granting or withholding relief during the pendency of the suit." *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland* at 387. Additionally, the harm that the defendant will suffer if the preliminary injunction is granted must be factored into the equation. For the plaintiffs to make the requisite showing, their harm added with the their likelihood of success must be greater than the defendants' harm when considered with their probability of success. Also, the Court must consider that "wild card that is the public interest." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986).

Judge Learned Hand reduced this principle to mathematical terms: $P \times Hp > (1-P) \times Hd$. *United States Carroll Towing Co.*, 159 F.2d 169, 173 (2nd Cir.1947). "P" represents the probability that the plaintiff will be successful on the merits at trial. This is multiplied by the "Hp," which represents the harm the plaintiff will suffer if the preliminary injunction is not issued. To grant the injunction the product of $P \times Hp$ must be greater than the product of multiplying the probability that the defendant will succeed at trial $(1-P)$ and the harm caused the defendant by granting the requested injunction (Hd).

■ This equation is not to be applied rigidly. However, it does provide a basic framework from which district courts can begin analysis of the injunction question. Judge Posner of the Seventh Circuit has written that:

> This formula ... is not offered as a new legal standard; it is intended not to force analysis into a quantitative straitjacket but to assist analysis by presenting succinctly the factors that the court must consider in making its decision and by articulating the relationship among the factors. It is actually a distillation of the familiar four (sometimes five) factor test that courts use in deciding whether to grant a preliminary injunction.

*American Hospital Supply v. Hospital Products, Ltd.* 780 F.2d 589 (7th Cir. 1985).

The one important variable which is not included in the formula is the public interest "wildcard." Further, since injunctive relief is equitable in nature, it is more important that the court's decision be just and fair, rather than correct. *Lawson* at 1435. District courts are to be flexible in both their analysis of whether to grant such an injunction and in determining the

appropriate remedy. In short, while the formula is an excellent aid, it is not a substitute for sound judgment. *Lawson* at 1434. With this standard the Court will now examine the facts sub judice and the applicable law.

### A. THE THRESHOLD

The plaintiffs must first show that there is not an adequate remedy at law. This rule is a holdover from the time in history when equity courts and legal courts were separate tribunals and equity courts only provided a remedy when there were no legal remedies available or the remedies which were available were ineffective. 11 Wright and Miller, Injunctions § 2944, pp. 392–394 (1973). The Seventh Circuit has stated there is no adequate remedy at law if the plaintiff "will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial ..." *Roland* at 386.

█ The plaintiffs herein initially sought only declaratory relief. By amended complaint they added a damages element. Despite, their primary remedy is injunctive. In cases such as this, claims that jail conditions are so poor that they are constitutionally violative, money damages are inadequate. The plaintiffs are seeking to correct conditions which presently exist; conditions which they contend pose an immediate threat to the health and safety of the inmates of the jail. These claims have no adequate remedy at law.

█ The plaintiffs must make a second showing: that they will suffer irreparable harm if the injunction is not granted. There is not one widely accepted definition of irreparable harm. Judge Friendly has defined irreparable injury as a "harm which cannot be repaired." *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2nd Cir.1966). Clearly, when only money is at stake there can be no irreparable injury. *Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34 (1st Cir.1986). However, the potential of a defendant becoming insolvent during the pendency of a lawsuit, hence unable to satisfy a judgment, may be a sufficient harm to justify the issuance of an injunction. The same is true if the injunction is necessary to save a plaintiff's business from insolvency. *Roland* at 386. The likelihood of injury must be real, not speculative. *Outboard Marine Corp. v. Liberty Mutual Insurance*, 536 F.2d 730 (7th Cir.1976). There must be a clear and present need for the injunctive relief to prevent some irreparable harm. *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669 (D.C. Cir.1984). Threat of continued violation of one's constitutional rights is proof of irreparable harm. *Ross v. Meese*, 818 F.2d 1132 (4th Cir.1987).

Assuming that the claims of the plaintiffs are true, the harms which they seek to prevent fall into the category of harms which cannot be remedied by money damages at a later date. The plaintiffs are current inmates. The conditions complained of by the plaintiffs involve threats to life and health—claims that warrant immediate remedy, if true. Whether the plaintiffs have proven that constitutionally violative conditions exist at the jail which require immediate relief is a question best left to the second part of the preliminary injunction methodology: balancing and weighing the respective harms and probability of success.

█ Initially, this court only needs to determine that the plaintiffs' chances of succeeding on the merits are better than negligible. It is the Court's opinion, based upon the facts discussed below, that the plaintiffs have established such. Having met the basic threshold requirement the Court must now undertake the more arduous task of weighing and comparing the relative harms that the parties may experience and the probabilities that each will be successful at trial.

### B. BEYOND THE THRESHOLD

At this stage the Court is to consider these factors: the harm the plaintiff will suffer if no injunction is issued; the likelihood that the plaintiff will win at trial; the harm that the defendant will experience as a result of issuance of an injunction; the

defendants' probability of succeeding on the merits; and the public interest, if any.

■■■■■■ The plaintiffs contend that the conditions at the jail amount to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. This provision prohibits the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), or punishment which is "grossly disproportionate to the severity of the crime." *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). A punishment is "unnecessary and wanton" when it lacks penological justification. *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2930. In determining whether punishment violates the Eighth Amendment courts are to be flexible, considering contemporary social standards. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The determination of whether a punishment violates the Eighth Amendment is one which is to rely on objective factors to the greatest extent possible; judges are not to impose their subjective beliefs concerning the appropriateness of a particular punishment. *Rhodes* at 346, 101 S.Ct. at 2399. The Eighth Amendment is not violated simply because a court would operate a facility in a different manner if it were in a position to do so. *Rhodes* at 351, 101 S.Ct. at 2401. "[T]he problems that arise in the day-to-day operation of a correctional facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1978). The Eighth Amendment does not permit a court to impose its own "notions of enlightened policy." *Hassine v. Jeffes*, 846 F.2d 169, 175 (3rd Cir.1988). The amendment is violated when inmates are deprived of "the minimal civilized measure of life's necessities." *Rhodes* 452 U.S. at 347, 101 S.Ct. at 2399.

Although specific instances of poor confinement conditions may not be violative of the Constitution, the totality of conditions in a penal institution may rise to the level of violating the Eighth or Fifth Amendments. *Tillery v. Owens*, 907 F.2d 418 (3rd Cir.1990).

Specifically, concerning medical care, the United States Supreme Court has established that there must be "deliberate indifference to serious medical needs of prisoners" for the Eighth Amendment to be violated. "This is true whether the indifference is manifested by prison doctors in their response to the prisoners' needs or by prison guards in intentionally delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–105, 97 S.Ct. 285, 291–292, 50 L.Ed.2d 251 (1976).

Negligent medical care does not give rise to a § 1983 claim, because to violate the Eighth Amendment the prison authorities must inflict "unnecessary and wanton pain." *Estelle* at 105, 97 S.Ct. at 291. Unintentional acts are not wanton. "[T]he infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense. Gross negligence is not enough." *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir.1985).

■■■■ The Eighth Amendment standard, however, applies only to inmates which have been convicted. "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilty in accordance with due process of law." *Bell*, 441 U.S. at 535, 99 S.Ct. at 1872. So, it must be determined if the condition imposed amounts to punishment.

■■■■■■ Mere restraint is not punishment, as it serves a legitimate purpose of assuring the detainee's appearance at trial. "A court must decide whether the disability

is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose." *Bell* at 538, 99 S.Ct. at 1873. As such, any act which violates a convicted inmate's Eighth Amendment rights also violates a pretrial detainee's due process rights. Since the standard for proving a Fourteenth Amendment claim is not as rigorous as an Eighth Amendment claim, a showing of deliberate indifference is unnecessary for claims of inadequate medical care. "However, the Due Process Clause does not require a showing of deliberate indifference ... this court specifically held that a pretrial detainee does not have to demonstrate 'that the official's acts must be unnecessary and deliberate or wanton or intentionally reckless or wrongful to constitute a constitutional deprivation actionable under 42 U.S.C. § 1983.' " *Matzker v. Herr*, 748 F.2d 1142, 1146 (7th Cir.1984), citing *Kincaid v. Rusk*, 670 F.2d 737 (7th Cir.1982). "Accordingly, a pretrial detainee's due process right to be free from punishment is violated when a jailer fails to promptly and reasonably procure competent medical aid for a pretrial detainee who suffers a serious illness or injury while confined." *Matzker* at 1147.

The conditions at the Perry County jail which the plaintiffs claim are in contravention of the Constitution are:

1. That the food served to the inmates in not nutritious;

2. that the jail does not provide for the basic hygiene of the inmates;

3. that the medical care in the jail is inadequate;

4. that the jail is overcrowded and the inmates are not properly segregated;

5. that the ventilation poses a health risk;

6. that the inmates are not provided with an adequate exercise area and the inmates are not exposed to adequate artificial and natural light;

7. that the plumbing poses a health risk; and

8. that the health and safety of the inmates is threatened by the absence of fire evacuation exits.

## 1. FOOD SERVICE

Inmates must be served nutritionally adequate food. The food must be "prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Shrader v. White*, 761 F.2d 975, 986 (4th Cir.1985), citing *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) [further cites omitted]. The plaintiffs have not made such a showing. Walter Smith (Mr. Smith), Indiana Department of Corrections Jail Inspector, testified that the jail has a dietitian approved menu. He stated that he knew of only one deviation from that menu. There was no showing that the substituted meal, in that instance, lacked nutritional value. The Indiana Board of Health Environmental Scientist, E.W. Berry (Mr. Berry), testified that in the past some meal portions had been inadequate and that food was served cold; however, he also testified that during his most recent inspections he discovered that the food situation had improved. Defendant, Oscar Ballis, testified that on occasion substitutions for scheduled meals are made, but that the substitutions come from the dietitian approved menu. William L. Miller states that during his incarceration no fruit or vegetables were provided. In contravention, the defense witness, Hazel Dodes, who has worked in the Perry County jail under two sheriffs preparing meals and acting as matron to the female inmates, testified that vegetables were provided and that pies containing fresh fruit were often served. William Miller testified that he was incarcerated for more than seventy (70) days, between January, 1989 and February, 1989. He complained that during his entire stay he received only bread heels; that he was never served a center cut of bread. He testified that this was true of all the inmates of the jail. However, there was no other evidence to support this allegation, and in fact, other inmates testified con-

versely.[1]

The Court observed a meal during its inspection. That meal consisted of approximately six boneless chicken pieces, what appeared to be fried potatoes, a piece of chocolate cake, and a drink. While it appears that the quality of the food at the Perry County jail could be improved, and possibly the inmates will be successful with this claim at trial, there has been no showing that the nutritional value of the food "presents an immediate danger" to inmates.

## 2. PERSONAL HYGIENE

The plaintiffs' second contention is that the inmates personal hygiene needs are neglected. Little evidence was presented at trial concerning this issue. Mr. Miller testified that the jail provided towels and that his family had to provide all other necessary items. He also testified that his family had to clean all his items, with the exception of his towels. It was also alleged that the jail was not providing haircuts. The defendants admit that to some extent they depend on the families and friends of inmates to supply hygiene items, but contend that if an inmate is unable to personally obtain such items, the jail provides them. There has been no proof that an inmate has been harmed as a result of this practice, nor is there a showing that an inmate might be harmed by the practice in the future.

## 3. MEDICAL CARE

A large part of the plaintiffs' evidence concerns their claim that the medical care provided the inmates is constitutionally inadequate and poses a threat to the well being of the inmates. The evidence does not support this contention.

The evidence shows that the jail has reached an agreement with a physician whereby he will make himself available to care for the inmates. He has done so. The plaintiffs complain that the jail doesn't have adequate in-house facilities, yet the

doctor is located within walking distance from the jail. In addition, a nurse from the Branchville Correctional Facility makes a medical call three times weekly, and a county nurse, who is located across the street from the jail, is available during business hours. It is the policy of the jail to transport inmates to a local hospital in emergencies. That hospital has an emergency medical unit which can respond to emergencies at the jail, if necessary. Of course, the jail is equipped with first aid kits.

It is also claimed that the defendants have refused necessary medical care to inmates. This is not supported by the evidence, with one exception. Mr. James was incarcerated in the Perry County jail from December 24, 1989 to May 1, 1990. He is diabetic and requires daily insulin injections. After going twelve days without an injection, during which time Mr. James repeatedly requested medical attention, he became very ill and required treatment at the local hospital. After returning from the hospital he again was refused insulin for two days. As a result of not receiving insulin injections Mr. James experienced swelling of his hands and feet, as well as a seriously high temperature. These conditions lasted for a full week. Mr. James did testify, however, that he was seen by a physician three or four times while incarcerated in the jail. When Mr. Jones arrived at the jail he had medication for his diabetes, in the form of tablets, which was to be a temporary substitute for insulin shots. This is, in part, the reason that jail officials did not respond to his needs quicker—they were of the belief that the pills can be used for a limited period, after which Mr. James must receive an insulin injection. Mr. James went too long without such an injection. Another cause of this situation is also the reason other problems exist at the jail—lack of fundings to adequately maintain the facility. The defendant introduced evidence of its costs; specifically, the medi-

---

1. The plaintiffs have provided no law which supports the conclusion that serving only the heels of bread rises to the level of violating the Fifth, Eighth or Fourteenth Amendments to the United States Constitution. Nor does the evidence lead to a finding that only heels are served at the jail. Any way its sliced, this allegation does not support issuing a preliminary injunction.

cal expenditures at the jail exceeded Four Thousand Dollars ($4,000.00) in 1989. Of course, this does not excuse inadequate care of prisoners.

On the other hand, Wayne Casper, a plaintiff in this action, testified that he has seen a nurse, physician, and a dentist since he has been incarcerated on January 5, 1990. He further testified that immediately after he complained of a swollen jaw he was examined by both a nurse and physician, who prescribed penicillin. That physician recommended that he be seen by a dentist and the jail respected that recommendation. After an examination the dentist extracted some of the plaintiff's teeth.

While the incident involving Mr. James is compelling it does not establish that this type of behavior is common or that it is likely to reoccur. "When the entire system for delivering medical services is challenged, deliberate indifference to inmates' health needs may be shown by proving repeated examples of denials of medical care which disclose a pattern of conduct by the prison medical staff, or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Gilland v. Owens*, 718 F.Supp. 665, 684 (W.D.Tenn.1989), citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980). Other than the incident involving Mr. James, there was no other credible evidence proving that the jail officials are deliberately or recklessly failing to procure medical care for the inmates of the jail. The evidence is that the sheriff made provision with a local physician to provide medical service; that nursing attention is available; and that a hospital is close and has a mobile medical unit available.

All of these facts, when taken as a whole, do not establish that the defendants will suffer irreparable harm if the Court does not grant the requested injunction.

### 4. OVERCROWDING/SEGREGATION

It is also alleged that the jail is overcrowded and that as a result of the over-crowding the prisoners are not properly segregated; that pretrial detainees are housed with convicted persons and violent prisoners with the nonviolent. These complaints are interrelated. Overcrowding refers to situations when the total number of inmates in a penal facility is so great that the institution's resources are excessively taxed. Normal capacity was defined by the American Justice Institute as "that population which best utilizes the recourses currently available. It should include some vacant beds to accommodate population surges and to allow for different classifications of inmates within institutional totals. It does not necessarily represent the fullest possible use of the plant...." *Costello v. Wainwright*, 539 F.2d 547 (5th Cir.1976), footnote 3. A penal facility is overcrowded when it is not possible to provide the basic services necessary for the day-to-day living of the inmates. *See Gilland.*

Segregation, in this context, refers to the separation of prisoners by classification. Improper segregation occurs when certain classes of prisoners are not separately confined, such as: the violent from the nonviolent; those that pose a medical threat from all other inmates; and male from female. The plaintiffs claim that both conditions exist at the Perry County jail.

The Perry County jail is relatively small, housing between thirty and fifty inmates at a time. The lock-up areas of the jail consist of two "bullpens," each containing four cell blocks with four bunks in each cell block. Hence, the two bullpens house thirty-two inmates total. There are three adjacent cells referred to as Max1, Max2, and a trustees' cell. There is also a holding cell and a women's cell.

The jail population includes pretrial detainees, convicted prisoners who are serving their entire sentence in the jail, prisoners from the Indiana Branchville Correctional Facility,[2] and local prisoners who are serving their sentences on the weekends. This last category of prisoners causes the jail population to increase on the weekends. Between January, 1990 and September, 1990 the number of inmates (twenty-four

---

**2.** Branchville is a medium security Indiana correctional institution.

hour) varied between twenty-five and thirty-seven. On the weekends the jail population increased between five and twelve inmates. The largest number to inhabit the jail during that period was forty-six.

Mr. Smith, testified that the jail is overcrowded thirty-five percent of the time. E.W. Berry testified that he has observed inmates sleeping on mattresses on cell floors. To alleviate the crowded conditions, the prisoners are not locked in their cells. They are permitted to move out of their cells into a larger open area, called the dayroom, which is also enclosed with bars. Each bullpen contains a dayroom. The large number of inmates contributes to the segregation problem.

 Evidence was presented that segregation of the Branchville prisoners from the local prisoners is not always possible. There was no evidence that segregation based on gender is or has been problematic. The periodic lack of segregation between Perry County inmates and Branchville inmates is the only proof of segregation problems at the jail. Plaintiffs contend it is a problem because the Branchville inmates tend to prey on the Perry County inmates. However, the jail officials do segregate when possible. In addition, while it appears that the Branchville inmates tend to be more violent than Perry County inmates, there has been no definite proof that the Branchville inmates pose a serious threat to the Perry County inmates. In order to establish an allegation of violation of one's right to be safe the alleged risk must be a "serious problem of substantial dimensions." *Withers v. Levine*, 615 F.2d 158 (4th Cir.1980), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). There has been no showing of irreparable harm by the plaintiffs. Further, the defendants would bear great expense and difficulty if required to change these conditions. As such, the Court finds that the population and segregation claims do not warrant issuing a preliminary injunction.

## 5. VENTILATION

The plaintiffs also complain that the ventilation in the jail is inadequate. There was testimony that described a cloud of smoke which hangs in the jail. The Court's inspection of the jail confirmed the presence of a heavy cloud of smoke in the jail. The cause of this condition appears to be poor ventilation and smoking by the inmates.[3] E.W. Berry testified that the ventilation is sometimes inadequate, especially in the holding cell, and that airborne bacteria may exist. However, on cross-examination, he testified that he had not conducted a thorough test of the conditions of the air in the jail and that he was speculating on direct examination when he stated that unhealthy airborne bacteria were present in the air.

Walter Smith testified that he tested the air flow in the jail and that the ventilation system was recirculating inside air, rather than pulling air from the outside, which is preferable. However, he admitted to not testing the quality of the air in the jail.

The jail is equipped with an air conditioning system with vents in each cell. Despite, the air is not well circulated and the jail remains warm. During the summer the air conditioning often "freezes up." When this happens the system must be shut off for hours to permit it to thaw out. During these times the jail becomes very hot and close. At least one blower unit is extremely rusted and full of dirt.

Clearly, the ventilation at the jail is poor and the plaintiffs are likely to be successful with this claim at trial. But, there has been no showing of immediate irreparable harm. The only evidence that the plaintiffs introduced to establish the medical risks of such a condition was that of Mr. Berry who testified that he had not conducted a thorough test of the jail's air conditions. Accordingly, no injunction can be issued concerning the ventilation of the jail.

## 6. EXERCISE AND EXPOSURE TO LIGHT

It is also contended that the inmates are not permitted enough exercise and are not exposed to adequate light.

---

**3.** Interestingly, plaintiff and inmate, Nathan Poehlein, testified that although he found the smoke in the jail uncomfortable, he preferred the status quo over a no-smoking requirement.

The jail's exercise area is limited to a small, vacant, fenced area outside the jail. The jail has no exercise equipment. Wayne Casper testified that inmates use the dayroom section of the jail to do calisthenics. Oscar Ballis testified that inmates are permitted to go outside into the fenced area four times yearly. The reason the inmates are not permitted outside more often is because of an understaffing of the jail. Nonetheless, the absence of exercise equipment and infrequent opportunities for inmates to go outside do not amount to irreparable harm.

The jail has no windows, and as such, no natural light comes into the jail. The artificial light in the jail is poor. This is caused, in part, by the design of the jail. Contributing to the problem is the fact that many of the lights are without bulbs. In one area the Court observed ten light fixtures. Of the ten, six fixtures had no bulbs and two bulbs were not lighted, presumably because they were burned out. This left two operational lights. Even in the remainder of the jail, where most of the fixtures were working, the lighting was dim. Again, the plaintiffs' likelihood of success at trial is more than marginal, but no showing of irreparable harm has been made. In fact, the plaintiffs put on no evidence concerning the amount of light that is necessary to prevent harm to the inmates; no evidence concerning what harm the inmates would suffer if not exposed to adequate lighting. The Court can not look to the facts that it has before it and conclude that irreparable harm will result prior to trial due to the lighting conditions at the Perry County jail.

### 7. PLUMBING FACILITIES

It is also claimed that the plumbing at the jail is often not operational and poses a health risk because it backs-up and leaves water standing in the cells.

Each bullpen is equipped with four toilets, four sinks, and one shower. The holding cell has its own shower and toilet, as do the other individual cells. The evidence shows that the jail authorities have to contend with not only normal maintenance, but with the mischief of the inmates. Prisoners commonly stop-up toilets with clothing, entire rolls of toilet paper, and other items.

Oscar Ballis testified that when a plumbing problem arises that a plumber is contacted immediately. One plaintiff, Wayne Casper, testified similarly. During the Court's visit only one toilet was not working. There is no merit to the claim that the plumbing fixtures at the jail are not adequately maintained.

It should be noted, however, that the plaintiffs' contentions concerning the condition of the showers are true. The showers are rusty and dirty and in serious need of a painting. Again, however, this court must refrain from running the show in Perry County. While regrettable, a rusty/filthy shower does not justify the intervention of a federal court into the administration of a county jail.

### 8. FIRE SAFETY

Finally, the last issue concerns the safety of the inmates during a fire. The jail has only one egress. According to Walter Smith the jail should have two means of exit in the event of a fire—one for each cell block. The jail is built of concrete and steel.

As previously stated, it is the policy of the sheriff to not lock the inmates into their cells, thereby allowing them to move into the enclosed day area. This policy is in effect day and night. The defendants contend that this increases the inmates safety, as it makes their release easier in the event of a fire. This appears to be true, as all the inmates in one bullpen could be released by opening one door, rather than having to open each cell individually, as well as the bullpen door.

The plaintiffs have not shown any reason to believe that the jail is particularly subject to the risk of fire. The sheriff has made an effort to increase the safety of the prisoners by not locking them into their cells. This policy is effective both day and night.

It may be true that Indiana law requires an additional fire exit, but it is not the duty of this Court to enforce that regulation.

834

The plaintiffs have made no showing of immediate irreparable harm.

III. CONCLUSION

 This jail facility is twenty-five (25) years old, consisting of concrete blocks and steel. Typical of most small counties, there exists a shortage of funds. Maintaining, repairing and building new jails is not usually on the commissioners' agenda along with the need for road improvement, etc. Whatever is done with regard to the jail is generally a reaction to a specific problem, which is usually regarded as an emergency. Once that need is satisfied the jail is forgotten until the next emergency.

The Perry County Jail is typical of most small county jails that have not been replaced by a new facility. Unfortunately, and understandably, a new jail does not become a reality in most instances unless the courts require it. Ideally, the initiative should originate with the local officials, but from a practical standpoint, it just doesn't and won't happen.

There is a misconception by the public and perhaps the elected officials responsible for maintaining the jail that the courts are demanding the upgrading of the jails to the point where they are like country clubs, with all the amenities of home. This is simply not the case. Rather, the role of the court is to require that the facilities and services to the inmates meet constitutional standards as set forth by the U.S. Supreme Court.

The Court's ruling on the preliminary injunction is not dispositive of what the outcome might be when the case is tried on its merits. The standard of proof at this stage of the proceedings is much higher, as proof of irreparable harm is not an easy task. The Court, in this opinion, is simply saying that the plaintiffs' allegations, when considered individually or in aggregate, do not legally warrant the issuance of a preliminary injunction. This is not to say that the Court is not concerned about the conditions at the jail or that ultimately the plaintiffs will not be successful. The Court is hopeful that the proper officials in Perry County re-evaluate and examine the needs of the jail in light of past judicial requirements, and take steps to alleviate or minimize the apparent inadequacies in a timely fashion.

Accordingly, the Court sets this matter for pre-trial conference before Magistrate William Hussmann, Jr. on MONDAY, JANUARY 7, 1991 at 10:00 o'clock, a.m. (Evansville Time). Magistrate Hussmann is to expedite the pre-trial stage of this case, insofar as is practical and fair. This case will be given preference over other civil matters for trial.

IT IS SO ORDERED.