CARDTOONS, L.C., Plaintiff,

v.

MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, Defendant.

No. 93–C–576–E.

United States District Court, N.D. Oklahoma.

Nov. 23, 1993.

---

Tilly & Ward, James W. Tilly, Keith A. Ward, Tulsa, OK, and Eric C. Cohen, Suzanne Hines, Welsh & Katz, Ltd., Chicago, IL, for Cardtoons, L.C.

Shughart, Thomson, & Kilroy, Dennis D. Palmer, Michael P. Allen, Kansas City, MO, and James E. Weger, Gregory K. Frizzell, Jones, Givens, Gotcher & Bogan, Tulsa, OK, for Major League Baseball Players Ass'n.

### *ORDER*

ELLISON, Chief Judge.

The Court has for consideration the Report and Recommendation of the Magistrate filed November 3, 1993. After careful consideration of the record and the issues, including the briefs and memoranda filed herein by the parties, the Court has concluded that the Report and Recommendation of the Magistrate should be and hereby are adopted by the Court.

IT IS THEREFORE ORDERED:

1. That the trial of this matter be consolidated with hearings held, in accord with Rule 65(e), Federal Rules of Civil Procedure. The Court finds the facts are straightforward and any further hearing is unwarranted;

2. That declaratory judgment be entered in favor of the Major League Baseball Players Association, to the effect that Cardtoons' seventy-one (71) players, twenty (20) Big Bank Buck and ten (10) Spectra cards, part of its "Baseball Parody Cards" set which depict the likenesses and parody names of active Major League Baseball players violates 12 O.S. § 1449(A) and the players' "rights of publicity", as embodied within that statute;[1]

3. That declaratory judgment be denied to Cardtoons, to the effect that it does *not* have a First Amendment right of free expression to market and sell its "Baseball Parody Cards" without license from the Major League Baseball Players Association;

4. That injunctive relief be denied to the Major League Baseball Players' Association, there being no showing of "irreparable harm"; and, the MLBPA having an otherwise adequate remedy at law;

5. That damages be denied to both parties, the evidence showing that no sales of the "Baseball Parody Cards" have been made.

ORDERED.

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

WOLFE, United States Magistrate Judge.

This report and recommendation addresses the following motions:

1. Plaintiff's *Motion For Temporary Restraining Order and Preliminary Injunction (docket # 2);*

2. Defendant's *Motion To Dismiss (docket # 6);*

3. Plaintiff's *Motion For Summary Judgment (docket # 11);* and

4. *Motion For Declaratory Judgment (docket # 17).*[1]

An evidentiary hearing was held on September 14 and 15, 1993. As a result of that hearing, the issues raised by the parties' various motions are subject to consolidation per Rule 65(a)(2), *Federal Rules of Civil Procedure,* discussed below.

### I. INTRODUCTION

Plaintiff filed its *Motion for Summary Judgment* (docket # 11) on August 6, 1993. On August 13, 1993 Defendant MLBPA filed its *Motion for Declaratory Judgment* (docket # 17), which is, in effect, a cross-motion for summary judgment. Both parties had earlier moved the court to grant injunctive relief (Plaintiff's *Complaint* (filed June 22, 1993); and Defendant's *Answer and Counterclaim* (filed August 4, 1993)).

An evidentiary hearing was set for September 14, 1993 and the parties filed their respective *Motions* in anticipation of that hearing and the evidence to be adduced as a result. The parties acknowledged that the central issue would be addressed by means of an evidentiary hearing on their respective cross-motions for judgment (Plaintiff raising the issue by means of its *Motion for Summary Judgment,* while Defendant raised the issue by means of its *Motion for Declaratory Judgment.)* The *Intermediate Scheduling and Discovery Order,* filed July 22, 1993 (docket # 3), sets forth the posture of the parties prior to the hearing as follows:

1. Plaintiff no longer seeks a Temporary Restraining Order or Preliminary Injunction. Plaintiff indicates that such a hearing would be futile, given the fact that its printer has already

---

1. This includes any other type of card within the set depicting a player's likenesses and parody name. It does *not* include the cards drawn by Dave Simpson, which do not depict players' likenesses, and which the MLBPA agrees, may be published. Nor does it technically include *former* Major League Players, whose interests are admittedly *not* protected by the MLBPA. The same analysis, however, would clearly apply to such persons, on an individual basis.

1. On July 12, 1993, the *Motion For Temporary Restraining Order* was referred to the Magistrate Judge. Pursuant to Fed.R.Civ.P. Rule 65(a)(2), the undersigned recommends that the case be treated as if a trial on the merits, as more particularly set forth below.

stopped production in response to a letter already sent by the Association. The "harm" sought to be protected against, in effect, having already occurred, Plaintiff does not seek to proceed with a Temporary Restraining Order or Temporary Injunction.

2. Plaintiff now seeks an evidentiary hearing on the ultimate question—that of the declaratory judgment.[2] Plaintiff's counsel requests a limited discovery period, followed by a prompt hearing, the court to decide, based on the presentation of evidence and stipulations of the parties, whether Plaintiff is entitled to declaratory relief, as sought.

3. Responsively, the Association wishes to raise a challenge to the court's jurisdiction. Additionally, the Association seeks to file its own motion for injunctive relief, seeking to halt the production of the allegedly offensive "parody" cards. (*Order* at p. 1).

As a result, each party contemplated introduction of evidence to bear on the ultimate question—whether Cardtoons would be permitted to publish its "parody" cards, or, whether publication would be halted in the face of a court decision that "Cardtoons, L.C. (Cardtoons) is liable to MLBPA for infringement of its rights of publicity under Okla. Stat.Tit. 21 § 839.2 (1993), Okla.Stat.Tit. 12 § 1449(a), and Oklahoma common law." (MLBPA's *Motion for Declaratory Judgment*, filed August 13, 1993). The parties specifically tried the issue of "declaratory relief", "*the remaining issues to be tried, dependent, in-part, on the outcome of the declaratory judgment question.*" (*Intermediate Scheduling and Discovery Order*, n. 2 at p. 1).

In sum, if the court finds that declaratory judgment should be granted to *either party*, this case is at an effective end. Cardtoons seeks a declaration that its cards do *not* infringe the MLBPA "rights of publicity",

citing First Amendment protection, while the MLBPA seeks a declaration to the opposite effect—*i.e.*, that the cards *do* infringe; hence, are not subject to publication absent license.

Given the foregoing analysis, the undersigned recommends that the evidentiary hearing be, in fact, and as a matter of law, consolidated with the trial of the matter, as set forth in Rule 65(a)(2), *Federal Rules of Civil Procedure*. That *Rule* provides, in-part, as follows:

> Before or after the commencement of the hearing of an application for preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

Here, the parties were prepared to go forward on the central issue, above, and, in fact, presented evidence in the form of testimony of their respective principles and experts. The only issue "reserved" by Cardtoons is that of "damages".

The parties were advised that the hearing would address the core issue in the case *vis-a-vis* MLBPA's "right of publicity" versus Cardtoons' "right of publication". Accordingly, both parties had notice of the trial of the issues, and, in fact, fully participated in presentation of evidence, testimony and argument on the central question.

After conducting the evidentiary hearing, the undersigned finds that presentation of further evidence or witnesses would not materially assist the court or, in fact, provide any further information about the parties or the issue than is presently now before the court for decision.

Accordingly, while Plaintiff's pending *Motion for Summary Judgment* (docket # 11) and its *Motion for Temporary Restraining Order and Preliminary Injunction* (docket # 2), together with Defendant's *Motion for Declaratory Judgment* (docket # 17) raise

---

**2.** Plaintiff states three claims: 1) Declaratory Judgment; 2) Tortious Interference with Contract; and 3) Injunctive Relief. The only issue on which Plaintiff wishes to proceed on an expedited basis is that of the question of declaratory relief. At the time of hearing Plaintiff no longer seeks injunctive relief. The issue, therefore, on which the court proceeds is that of declaratory relief, the remaining issues (Tortious Interference with Contract) to be tried, dependent, in-part on the outcome of the declaratory judgment question.

the issues in this action, they are subsumed in the consolidation of the hearing with trial on the merits per Rule 65(a)(2), *infra.* This report and recommendation addresses the issues in the following order:

*First,* the report and recommendation advances the issues and addresses *consolidation* of the hearing with trial on the merits per *Rule 65(a)(2), Federal Rules of Civil Procedure.*

*Second,* the report and recommendation recites the facts of the case, together with the findings of fact of the court, as stipulated to by the parties and as found by the court.

*Third,* the report and recommendation deals with the jurisdictional issue raised by Defendant MLBPA in its *Motion to Dismiss.*

*Fourth,* the report and recommendation considers and makes recommendation on the merits of the action as presented by both parties.

*Fifth,* the report and recommendation addresses injunctive relief sought by MLBPA.

The facts of the case are initially set forth below.

## II. PROCEDURAL HISTORY/FACTS

The dispute began when Plaintiff Cardtoons L.C., ("Cardtoons") a Tulsa-based company, designed "parody" trading cards of active major league baseball players. Cardtoons did not obtain either a license or consent from Defendant Major League Baseball Players Association ("MLBPA"). (*See, Joint Stipulation of Fact,* at p. 3, ¶ (10), appended hereto as "Exhibit A"). As a result, prior to full publication of the cards, the MLBPA sent Cardtoons and its printer a cease-and-desist letter. Cardtoons countered by filing

its *Complaint for Declaratory Judgment* and *Application for Temporary Restraining Order and Preliminary Injunction.*[3]

The MLBPA is an unincorporated association that serves as the exclusive collective bargaining agent for all major league baseball players.[4] Since 1966, MLBPA has had a "group licensing program" where the Association acts as the assignee of individual publicity rights for all active major league baseball players.[5]

In late 1992, J Fromm formed Cardtoons to produce trading cards featuring parodies of active major league baseball players. He subsequently contracted with several persons, including a well-known editorial cartoonist, a sports artist and a free-lance writer to draw and write text for the cards. Fromm called the company *Cardtoons, L.C.* ("Cardtoons").

During the first six months of 1993, Cardtoons designed a set of 130 cards, 71 of which feature caricatures of active major league baseball players. The balance of the set includes 11 "political" cards, featuring no particular players, 10 "retired" player cards, 10 "Spectra" cards, 20 Big Bang Buck cards (which also feature facial caricatures of active players) and 8 "Standing" cards. (*See, Joint Stipulation of Fact,* p. 2, ¶ (9).) The company implemented a marketing plan and entered into contracts with a printer ("Champs") and a distributor ("TCM"). (*See, Joint Stipulation of Fact,* p. 3, ¶ (12).)

As a part of its marketing plan, Cardtoons placed an advertisement in the May 14, 1993 issue of *Sports Collectors Digest.* The advertisement "tipped off" MLBPA, prompting its attorney to write a letter to Cardtoons. Part of the June 18, 1993 letter read:

---

3. Cardtoons seeks to prevent the MLBPA from interfering with publication by invoking a First Amendment "right" to parody major league players and baseball. The MLBPA seeks injunctive relief, asking the court to *prevent* publication, reaffirming its "right of publicity". The ultimate issue is whether Cardtoons' alleged parody of the baseball players should receive First Amendment protection.

4. The MLBPA's principal place of business is New York City. *See, Joint Stipulation of Fact,* at p. 1, ¶ (2).

5. The MLBPA has entered into group licensing arrangements for a variety of products, including candy, cookies, cereals and baseball trading cards. In each case, the licensees were authorized to use the major league players' names and likenesses on or in connection with a product or service. In exchange, the licensee paid the MLBPA a royalty and/or a promotional fee. Revenues from the group licensing program are distributed to major league players in according with MLBPA policies. Currently, the MLBPA has licensed six companies for the manufacture and sale of baseball trading cards.

It has come to our attention that you and others using the name "Cardtoons" re producing, advertising, distributing and selling color drawings of Major League baseball players in baseball trading card sets. Your use of the likenesses of active Major League baseball players in this manner is for your commercial benefit. Your activities violate the valuable property rights of MLBPA and the players. On behalf of MLBPA, we request that you and all other individuals associated with "Cardtoons" *immediately* cease and desist the production, promotion, distribution and/or sale of baseball trading cards depicting Major League baseball players ... If I do not hear from you immediately confirming that you will agree to this request, I will have no alternative but to take all necessary action to enforce the rights of the playing and the MLBPA against infringement of their rights. *Exhibit 81.*

The MLBPA sent a similar letter to Champs (Cardtoons' printer). That letter, also sent on June 18, 1993, instructed Champs to "cease and desist the printing of baseball trading cards". *Exhibit 82.* Four days later, Cardtoons filed the instant lawsuit.

Cardtoons' *Complaint* seeks declaratory judgment pursuant to Chapter 22, Title 15 of the United States Court (*The Lanham Act*). Cardtoons also stated claims for tortious interference with contract and injunctive relief. MLBPA subsequently filed counterclaims and a request for declaratory judgment under 1) Okla.Stat. tit. 21 § 839.1; 2) Okla. tit. Stat. 12 § 1449(A); and 3) common law misappropriation. MLBPA did *not* file a claim under the Lanham Act.[6]

During the evidentiary hearing, the following findings of fact were adduced:

6. On August 4, 1993, MLBPA filed a *Motion To Dismiss* (docket # 6) on jurisdictional grounds. Cardtoons filed its *Motion For Summary Judgment* (docket # 11) on August 6, 1993.

7. "Baseball cards" are printed on stiff cardboard paper stock, measuring 3.5″ by 2.5″, usually depicting a photograph or image of a major league baseball player on one side, and written information about the player on the reverse side.

1. Cardtoons is a commercial venture designed to make money for its principals. The 130 cards designed by the company are similar to traditionally published "baseball cards".[7] Cardtoons' stated objective is to inform, entertain and "make fun" of major league baseball players, baseball, and baseball cards.

2. Of the 130 cards designed by Cardtoons, 71 depict active major league players. Twenty (20) "Big Bang Buck" and ten (10) "Spectra" cards also feature caricatures of players' faces and humorous commentary about their careers. Despite changes in names, a reasonable person familiar with the sport can readily identify the players depicted on the cards. Identification is facilitated by similar names, the same Major League team colors and caricatures closely resembling likenesses of well-known major league baseball players. In addition to caricatures, the back of each of the foregoing cards includes commentary, humor and facts about the players and/or the sport of baseball.

3. Cardtoons does not have a license from MLBPA. Six other companies do have licenses from MLBPA. Those licensed companies (all of whom manufacture and sell baseball cards) produce an estimated $1.3 billion annually in sales.[8] MLBPA receives royalties from those sales, which, in turn, are paid to the individual major league baseball players.

4. Judith Heeter, attorney and Director of Licensing for MLBPA, testified that the MLBPA would *not* license Cardtoons for the following reasons:

(a) Due to what MLBPA perceives as a "glut" in the market, it does not make good business or economic sense to license additional card companies at this time;

8. Notably, Topps Chewing Gum Company, Inc. is *not* licensed, yet is the largest card company in the country. It's special status exists as a result of the fact that it historically *preceded* the MLBPA, entering into *individual* contracts with players, hence is not required to be "licensed" by the MLBPA.

(b) Even if MLBPA were to decide to license another card company, there are other, more established companies than Cardtoons already on the "waiting" list; and

(c) One of MLBPA's objectives is to *boost* the image and salaries of major league baseball players.

Heeter testified that she believes that Cardtoons' card product would *decrease* the image—not enhance it. Consequently, she testified that the MLBPA would *never* license a parody which poked fun at the players.

5. Judith Heeter further testified that the MLBPA does *not* object to parody of the sport generally, so long as individual players' likenesses are not used without their permission.

6. Cardtoons' printer is prepared to continue printing the cards and commitments to purchase some 3995 cases are already in hand.

7. The seventy-one (71) cards depicting major league baseball players, together with the twenty (20) "Big Band Buck" and ten (10) "Spectra" cards are *as a matter of fact,* "parodies" of the players they depict; at least insofar as the term "parody" is commonly understood.

8. The court adopts the *Joint Stipulation of Fact* entered into by the parties, and attaches the stipulation here as "Exhibit A".

The jurisdictional issue raised by MLBPA is addressed initially, below.

## III. DEFENDANT'S MOTION TO DISMISS

The issue raised by MLBPA is whether "federal question" jurisdiction exists. According to Cardtoons' *Complaint,* the matter in controversy does *not* exceed $50,000 as is required for diversity jurisdiction. Indeed, no pleading invokes diversity jurisdiction and the question has not been raised by the parties. Since diversity jurisdiction is not pled under 28 U.S.C. § 1332, the question becomes whether jurisdiction exists under 28 U.S.C. § 1331.

■ Federal question jurisdiction emerges under two circumstances: (1) When federal law creates a cause of action; and (2) A substantial federal question springs from a state law cause of action. *W. 14th Street Commercial Corporation v. 5 W. 14th Owners Corporation,* 815 F.2d 188, 192 (2nd Cir. 1987).

In a complaint for declaratory judgment such as this, the jurisdictional question is more complex. The posture of the parties is reversed. The issues raised in the *Complaint* are in large measure the *defenses* plaintiff would raise if defendant were to bring a coercive action against it. *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1117 (S.D.N.Y. 1980).

■ A declaratory judgment is complicated because the existence of a federal question raised as a *defense* does *not* suffice to bring an action under the district court's jurisdiction—even if the plaintiff's complaint anticipates the defense and incorporates the federal question. *Id., citing, Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Therefore,

a court must look beyond the declaratory judgment allegations and determine whether a substantial federal question arises either from the *defendant's threatened action* or *from the complaint when viewed as a request for coercive relief apart from the defendant's anticipated suit.* (emphasis added) *W. 14th Street Commercial Corp.,* 815 F.2d at 194, citing *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 16 n. 14, 103 S.Ct. 2841, 2849 n. 14, 77 L.Ed.2d 420 (1983); and *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 327–328 (2d Cir.1982).

■ In the case at bar, the pertinent jurisdictional facts are as follows: MLBPA sent Cardtoons a "cease-and-desist" letter threatening to "take all necessary action to enforce the rights of the playing and the MLBPA against *infringement* of their rights." (Emphasis added.) That letter, coupled with the fact that MLBPA had filed claims under the Lanham Act in similar cases (and could have

in this one)[9], prompted Cardtoons to file a *Complaint* in this Court seeking a declaratory judgment "declaring that the Cardtoons Baseball Parody Cards do not violate the rights of publicity or other property rights of MLBPA ... including any rights which the MLBPA or its members may claim to possess pursuant to Chapter 22, Title 15 of the United States Code." *Complaint*, page 3 (docket # 1). When MLBPA filed its *Answer*, it included only state law counterclaims.

After examining the pleadings as a whole, and upon conducting an evidentiary hearing, the undersigned finds federal question jurisdiction exists for three reasons.

First, MLBPA's "threatened action" is clear given its previous history and the letter: it would take *"all necessary action* to enforce the rights of the playing and the MLBPA against *infringement* of their rights." A threat of a Lanham Act claim is, under the circumstances, reasonably presumed and is similar to cases where a supposed patent infringer seeks a declaratory judgment that he has not interfered with the patentee's rights. *See, Bell & Beckwith v. United States, I.R.S.,* 766 F.2d 910, 913 (6th Cir.1985) (*"federal question jurisdiction exists in suit that anticipates coercive action under various federal laws, including patent law"*).[10] The fact that MLBPA could have filed such a claim (but declined to) does not defeat federal question jurisdiction.[11]

Second, a substantial First Amendment question is at the heart of this case. Both the pleadings and the debate at the evidentiary hearing ardently illustrate the First Amendment significance of this dispute. The crucial inquiry, whether applying state law or the Lanham Act, is whether the First Amendment protects a for-profit company such as Cardtoons from publishing a parody of prominent professional athletes without their consent. *See, Complaint* (docket # 1) and *Plaintiff's Application For Temporary Restraining Order* (docket # 2).

In *Monks v. Hetherington,* 573 F.2d 1164, 1166 (10th Cir.1978), the court held that the "likelihood or even [the] probability" that a First Amendment defense will arise does not constitute a basis for federal question jurisdiction. In this case, however, the First Amendment is more than just a defense—it is an essential element of the litigation similar to the dispute in *Dworkin v. Hustler Magazine,* 611 F.Supp. 781, 784 (D.C.Wyo. 1985).

In *Dworkin, Hustler* magazine published derogatory material about the plaintiff. Plaintiff then sued for libel and defamation. In addition, plaintiff asserted that *Hustler* had used the First Amendment to "thwart [her] political and social activities ... as well as silence her exercise of her right to free speech." *Id.* at 784. After examining the issue, the court wrote:

> The Court must conclude, however, that in order to properly assess plaintiffs' claim, it

9. Cardtoons has attached two *Complaints* recently filed by MLBPA in other federal courts. On January 21, 1992, MLBPA sued Aggressive Management under the Lanham Trademark Act. *See, Exhibit A of Plaintiff's Brief* (docket # 19). A second case filed in a New Mexico district court also shows that MLBPA filed a counterclaim under the Lanham Act. *Id.* at "Exhibit B". The facts in those cases involved companies that were publishing books containing photographs of active major league baseball players.

10. See, also, *W. 14th Street Commercial Corporation,* 815 F.2d at 195 where the court states: "Yet, under *Franchise Tax Board,* the question is *not* whether the declaratory judgment defendant would necessarily bring a federal action, but rather if it brought an action would such an action necessarily have raised a federal question." Had MLBPA brought a trademark infringement claim or other claim under the Lan-

ham Act that would certainly have raised a federal question. Plaintiff is *not* precluded from raising a Lanham Act question, given the preserve of a "case or controversy".

11. By adopting MLBPA's argument, it would appear that any declaratory judgment defendant could avoid federal jurisdiction by simply not pleading a federal claim in its *Answer* and/or *Counterclaim.* Thus, as in this case, federal question jurisdiction would exist when Cardtoons' filed its *Complaint* asserting federal question jurisdiction under the Lanham Act. But when the defendant decided not to file the anticipated federal claim—whether it be for legitimate reasons or because of strategic reasons, federal jurisdiction would end. The Magistrate Judge also notes that the facts here (i.e. MLBPA, in effect, shutting down Cardtoons' manufacturing and distribution of its product) is a clear "case or controversy".

will be necessary to construe the First Amendment right of free speech and cases dealing with such rights. This case is distinguished from Monks [supra] ... in which the First Amendment was invoked essentially as a defense in a declaratory judgment case. Although defendants will certainly rely for a defense on the First Amendment, plaintiff does also ... This clearly involves a dispute respecting the construction and effect of the First Amendment. *Id.* at 784–785.[12]

Here, Cardtoons did not specifically recite a First Amendment claim in its *Complaint* as did plaintiffs in *Dworkin*. The *Complaint*, however, coupled with Cardtoons' *Application For Temporary Restraining Order and Preliminary Injunction* is similar to *Dworkin* in that it involves a substantial First Amendment question. Furthermore, the First Amendment claim is made abundantly clear in light of the evidentiary hearing. In essence, Cardtoons asserts that it has a "First Amendment" right to parody, refuted by MLBPA. The MLBPA asserts that the players' "right of publicity" allows them to control commercial use of their likenesses, derogating any First Amendment claim to such right. As a result, this action involves a dispute "respecting the construction and effect of the First Amendment." [13] Third, and finally, the Second Circuit emphasized that "not every case or cause of action that knocks on the federal courthouse door gains entrance". *W. 14th Street Commercial Corporation,* 815 F.2d 188, 193 (2nd Cir.1987). The question here is whether to kick the parties back out the courthouse door. Judicial economy dictates against that result. The evidentiary hearing clearly raised fundamental "First Amendment" questions as a result of the parties' actions. Such questions, apart from invocation of the Lanham Act, confer jurisdiction upon the court in accord with 28 U.S.C. § 1331. Supplemental

jurisdiction over state-law claims is exercised in accord with 28 U.S.C. § 1367.

Given the assertion of valid First Amendment concerns, as well as invocation of a valid "case or controversy" under the Lanham Act, the Magistrate Judge recommends that MLBPA's *Motion To Dismiss* be denied.

## IV. DECLARATORY JUDGMENT

The central issue, as set forth above, focuses on the question whether MLBPA's "right to publicity" gives way to alleged First Amendment freedoms taking the form of parody (a so-called "right to publication"). The applicable Oklahoma state statute creating a "right of publicity" is found at 12 O.S. § 1449(A). The initial question is whether Title 12 O.S. § 1449(A) is violated by the proposed Cardtoons' parody.

### A. Has Cardtoons Violated Tit. 12 Okla. Stat. § 1449(A)?

The "right to publicity" was recognized 40 years ago when two rival chewing gum manufacturers squabbled over "exclusive rights" to professional players' photographs. *Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866, 868 (2d Cir. 1953). In resolving the dispute, the Second Circuit concluded that a "man has a right in the publicity value of his photograph." *Id.* at 868. It wrote:

> It is common knowledge that many prominent persons (especially actors and ballplayers) ... would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains, and subways. This right to publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures. *Id.*

---

12. See, also, *Mountain Fuel Supply Co. v. Johnson,* 586 F.2d 1375, 1381 (10th Cir.1978) (A case arises under the Constitution of the United States if it clearly and substantially involves a dispute or controversy respecting the validity, construction or effect of the Constitution which is determinative of the resulting judgment.)

13. While the *Complaint* fails to involve the First Amendment *per se,* the supporting pleadings, and entire focus of oral and evidentiary presentations focus on this fundamental principle; particularly as applied to the governing Oklahoma Statute, Title 12 O.S. § 1449.

Since that case, the right has been similarly acknowledged in most states either by common law or statute.[14] While courts have not uniformly applied the tort, most agree concerning the right's general purposes. First, the right to publicity recognizes the economic value of an individual's identity. Second, the publicity right is an incentive for creativity, encouraging the production of entertaining and intellectual works. Finally, the right prevents unjust enrichment of those who usurp the identity of another. *1989 Ann.Surv.Am.L. 211*. Wrote the Sixth Circuit:

> The right of publicity has developed to protect the commercial interest of celebrities in their identities. The theory of the right is that a celebrity's identity can be valuable in the promotion of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity ... The famous have an exclusive legal right ... to control and profit from the commercial use of their name and personality. *Carson v. Here's Johnny Portable Toilets*, Inc., 698 F.2d 831, 835 (6th Cir.1983), citing in *Memphis Development Foundation v. Factors etc.*, Inc. 616 F.2d 956 (6th Cir. 1980).

In 1986, Oklahoma codified the "right of publicity" at 12 Okla.Stat. § 1449(A). The language, virtually identical to California law, reads:

> A. Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or services, ... without such person's prior consent ... shall be liable for any damages sus-

tained by the person or persons injured as a result thereof, and any profits from the unauthorized use that are attributable to the use shall be taken into account in computing the actual damages ...

To prove that § 1449(A) has been violated, MLBPA must show that Cardtoons has: (1) "knowingly" used MLBPA's "name" or "likeness"; (2) on "products, merchandise or goods"; (3) without MLBPA's prior consent. If MLBPA proves those elements, the "burden" shifts to Cardtoons to raise a valid defense.

Little question exists that Cardtoons "knowingly" set out to parody the "marquee" players of major league baseball. Both the testimony of Fromm and review of the cards make this virtually self-evident.

■ The next question is whether the cards contain the "likeness" and/or "name" of MLBPA players. While Oklahoma courts have not defined the word "likeness", "right to publicity" decisions by New York courts have interpreted the phrase "portrait or picture" as "any recognizable likeness." *Allen v. National Video, Inc.*, 610 F.Supp. 612, 622 (D.C.N.Y.1985).[15] Applying this analysis to the Oklahoma statute, the undersigned finds that "likeness" means "any recognizable likeness." [16]

In the case at bar, each of the 71 cards in question has a "recognizable likeness". Similarly, the 20 "Big Bang Buck" cards depict a "likeness" of the players' faces. First, the caricatures on each of the foregoing and ten (10) "Spectra" cards have identifying characteristics and/or features of the "real life"

**14.** Twelve states including Oklahoma have codified the "right to publicity."

**15.** Many cases involving the "right to publicity" tort involve interpretations of New York law. To make out a violation under sections 50 and 51 of the New York Civil Rights Law, a plaintiff must satisfy three distinct elements: (1) use of his or her name, portrait or picture, (2) for commercial or trade purposes, 3) without written permission. It should be noted that, while the rulings of the New York cases help guide the Court, the New York statute, in effect, includes both "right to privacy" and "right to publicity" claims. Oklahoma, on the other hand, has distinct statutes.

Oklahoma's right to privacy statute appears at 21 Okla.Stat. § 839.1 while the right to publicity statute is at 12 Okla.Stat. § 1449.

**16.** The *American Heritage Dictionary* defines "likeness" as: 1. The state or quality of resembling or being like something. 2. An imitative appearance; semblance. 3. A pictorial, graphic, or sculptured representation of something; image. See, also, *Jacqueline K. Onassis v. Christian Dior*, 122 Misc.2d 603, 472 N.Y.S.2d 254, 258–259 (N.Y.1984) (Broad interpretation of New York right to privacy statute).

player they portray.[17] Second, in each case, the cards contain at least a part of the player's name.[18] Third, while the real team names are not used in the cards, the "parody" teams are easily linked to professional baseball franchises by color and nicknames.[19] In addition, in some cases, the text on the back of the card identifies the player discussed. Arguably, the caricature without the name would not be a "recognizable likeness". But a reasonable person, familiar with the sport, taking into account each of the foregoing factors in combination with the others can readily identify the real players "parodied" on Cardtoons's cards.

Of further note is the holding in *Ali v. Playgirl*, 447 F.Supp. 723 (S.D.N.Y.1978). In that case, *Playgirl* magazine published a portrait of a nude black man seated in the corner of a boxing ring. The picture was captioned the "Mystery Man", but the man was referred to as "the Greatest." The court wrote:

> Even a cursory inspection of the picture ... strongly suggests that the facial characteristics of the black male portrayed are those of Muhammad Ali ... in addition, the figure depicted is seated on a stool in the corner of a boxing ring with both hands taped and outstretched resting on the ropes on either side. Although the picture is captioned the "Mystery Man", the identification of the individual as Ali is further implied by an accompanying verse which refers to the figure as "the Greatest." This court may take judicial notice that plaintiff Ali has regularly claimed that

appellation for himself and that his efforts to identify himself in the public mind as "the Greatest" have been so successful that he is regularly identified as such in the news media. *Id.* at 726–727.

Even cursory inspection of the cards subject of this action suggests they are even more identifiable than the picture in *Ali*. Accordingly, the undersigned finds, as a matter of fact, and as a determination of law, the instant 101 cards depict a "likeness" as the term is used in Title 12 O.S. § 1449(A).

Finally, the third element of the statute is satisfied by the stipulation of the parties that MLBPA has *not* consented to Cardtoons' use of the major league players' likenesses.[20] In sum, notwithstanding any First Amendment defense, Cardtoons' prospective use of players' likenesses on its cards is violative of subsection A of § 1449 if the cards are *sold* as a commercial product.[21]

■ Therefore, the central issue is whether Cardtoons has a defense under either subsections (D) or (E) of § 1449, or, under the First Amendment to the United States Constitution. Subsection (D) states:

> For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subsection A. ...

Subsection (E) reads:

---

17. For example, San Francisco Giants outfielder Barry Bonds wears an earring. The caricature of "Treasury Bonds" also has an earring and, in fact, bears resemblance to the real player Bonds. The same holds true for St. Louis Cardinal shortstop Ozzie Smith, whose trademark is doing back flips when he walks on to the field. "Ozzie Myth" is shown doing a backflip on the Cardtoons' card. Cards featuring "Fowl Boggs" (resemblance to Wade Boggs) and "Cloud Johnson" (play on Seattle Mariners' pitcher Randy Johnson's height of 6–foot–10) are other examples.

18. Chicago Cubs' first baseman Mark Grace is dubbed "Amazing Grace." San Diego outfielder Tony Gwynn is called "Tony Twynn". Baltimore Orioles' shortstop Cal Ripken is named "Cal Rip-

kenwinkle." New York Yankees' first baseman Don Mattingly is described as "Don Battingly".

19. The St. Louis Cardinals are renamed the "Credit Cards" and clad in the same colors as the real major league team. The Los Angeles Dodgers are called the Codgers. The Seattle Mariners are the "Mari–Nerds". The Texas Rangers are the "Strangers" and so on.

20. Judith Heeter also testified in no uncertain terms that no consent was given by MLBPA.

21. Again, little question exists as to this point. The evidence amply demonstrates that the cards (either in "wax packs", boxes or cases) are to be widely marketed, and *sold* at retail for profit. For further discussion, see the recitation of "facts" *supra*, and the *conclusion, infra*.

The use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subsection A of this section solely because the material containing such use is commercially sponsored or contains paid advertising. Rather it shall be a question of fact whether or not the use of the person's name ... or likeness was so directly connected with the commercial sponsorship or with the paid advertising to constitute a use for which consent is required under subsection A of this section.

Neither of the subsections help Cardtoons. Cardtoons' commercial venture is *not* "in connection with any news, public affairs, or sports broadcast or account or political campaign." Furthermore, the evidence at the hearing established that the company's use of the players' likenesses is "directly connected" with their proposed commercial endeavor; *i.e.* the players were selected to parody because of their popularity and public appeal.[22]

### B. Other (Non–Parody) First Amendment Defenses to § 1449(A) [23]

MLBPA asserts that no defenses outside what is expressly stated in § 1449 apply. *See, United States v. Goldbaum,* 879 F.2d 811, 813 (10th Cir.1989) ("As a general principle of statutory interpretation, if a statute specifies exceptions to its general application, other exceptions not explicitly mentioned are excluded"), citing *United States v. Jones,* 567 F.2d 965, 967 (10th Cir.1977). Case law suggests, however, that other First Amendment defenses do exist beyond those in the

statute.[24] Accordingly, these are discussed, below.

The "newsworthiness" defense, while not uniformly defined by the courts, is said to be "the use of a person's name or picture in the context of an event within the orbit of public interest and scrutiny." *Ann–Margret v. High Society Magazine, Inc.,* 498 F.Supp. 401 (S.D.N.Y.1980). Even matters of "entertainment and amusement, concerning interesting phases of human activity" are considered newsworthy. *Id.*

A successful use of the "newsworthiness" defense is found in *Paulsen v. Personality Posters, Inc.,* 59 Misc.2d 444, 299 N.Y.S.2d 501 (N.Y.1968). In that case, actor Pat Paulsen of the Smothers Brothers television show jokingly announced his intention to run for President of the United States. Paulsen then licensed a California company to sell campaign buttons, stickers and posters "promoting" the "Pat Paulsen for President" campaign. Defendant, however, began *selling* posters that were not licensed by and/or consented to Paulsen.

The New York Supreme Court ruled that defendant did *not* violate Paulsen's right of privacy. The court stated that Paulsen had "projected himself into the national political scene" and, as a result, the poster was "sufficiently relevant to a matter of public interest to be a form of expression which is constitutionally protected and deserving of substantial freedom." *Id.,* 299 N.Y.S.2d at 507. In the decision, the court also discussed the concept of newsworthiness:

---

**22.** Arguably, subsection D encompasses the "newsworthiness", exception discussed below. In addition, subsection E appears to contemplate the issue of "incidental use", also explained below.

**23.** The interplay of the First Amendment and the "right to publicity" has been the subject of many law journal articles. For example, see, James Barr Haines, *First Amendment II: Developments In The Right of Publicity,* 1989 Ann.Surv.Am.L. 211 (1990); Peter L. Fencher and Edward L. Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media,* 88 Yale L.J. 1560 (1979) and Pamela Samuelson, *Reviving Zacchini: Analyzing First Amendment Defenses In Right of Publicity and Copyright Cases,* 57 Tul.L.Rev. 836 (1983).

**24.** Courts have fashioned such defenses, in part, because of the inherent tension between the First Amendment and the "right to publicity." *See,* for example, *Titan Sports v. Comics World Corp.,* 870 F.2d 85, 88 (2nd Cir.1989) ("A court must be ever mindful of the inherent tension between the protection of an individual's right to control the use of his likeness and the constitutional guarantee of free dissemination of ideas, images and newsworthy matters in whatever form it takes.") *Also, see Rosemont Enterprises v. Random House,* 58 Misc.2d 1, 294 N.Y.S.2d 122, 129 (N.Y.1968) ("Just as a public figure's right of publicity must yield to the public interest so too must the right of publicity bow where such conflicts with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest.").

It was early held that newspapers, magazines, and newsreels are exempt from the statutory injunction when using a name or picture in connection with an item of news or one that is newsworthy and such privileged status has also been extended to other communications media including books, comic books, radio, television and motion pictures ... Indeed, it is clear that any format of the 'written word or picture' including posters and handbills will be similarly exempted in conjunction with the dissemination of news or public interest presentations.

The scope of the subject matter which may be considered of 'public interest' or 'newsworthy' has been defined in the most liberal and far reaching terms. The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to including all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phrases of human activity in general. *Id.* at 506.[25]

A second First Amendment defense discussed by courts is that of "incidental use." The incidental use exception was recognized by a New York court where a newspaper advertisement for a magazine reprinted a news-related photograph from one of the magazine's earlier issues. The court recognized that the advertising was "incidental" to the original, newsworthy publication. *Booth v. Curtis Publishing,* 11 N.Y.2d 907, 228 N.Y.S.2d 468, 182 N.E.2d 812 (1962). *Also, see, Namath v. Sports Illustrated,* 48 A.D.2d 487, 371 N.Y.S.2d 10 (1st Dept.1975) (Use of athlete's photograph was "merely incidental" to advertising of magazine, which had carried articles about him); *Lawrence v. A.S. Abell Company,* 299 Md. 697, 475 A.2d 448 (Ct. App.1984) (Use of photos of children at public festival held incidental and newsworthy); and *Velez v. VV Publishing Corporation,* 135 A.D.2d 47, 524 N.Y.S.2d 186 (N.Y.1988).

The First Amendment defense as raised in a "right to publicity" case was examined by the United States Supreme Court in *Zacchini v. Scripps–Howard Broadcasting,* 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977). That case involved a free-lance reporter who videotaped Hugo Zacchini's "human cannonball" act. The 15–second tape of Zacchini's entire act was then broadcast on the 11 p.m. news. Zacchini gave no permission for the recording, nor did he receive any compensation. The entertainer sued, claiming the television station violated his "right to publicity."

The Court described the "right of publicity" as "closely analogous to the goals of patent and copyright [laws] focusing on the right of the individual to reap the reward of his endeavors." *Id.,* 433 U.S. at 573, 97 S.Ct. at 2856. The Court acknowledged that "entertainment" as well as "news" enjoyed First Amendment protection, but also stated:

> It is evident ... that petitioner's state-law right of publicity would not serve to prevent respondent from reporting the newsworthy facts about petitioner's act. Wherever the line in particular situations to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner. *Id.* at 574–575, 97 S.Ct. at 2857.

*Zacchini,* in effect, concluded that the media could not air a performer's "entire act" without compensation. Such a ruling, while recognizing the tension between the First Amendment and the right of publicity, did little to clarify the issue. *See, Rubin,* supra, ("So long as the relationship between the right of publicity and the First Amendment is not confronted directly, inconsistent holdings are virtually inevitable.") As a result, it

---

**25.** Also, see, *Hicks v. Casablanca Records,* 464 F.Supp. 426 at 427 (S.D.N.Y.1978) ("First Amendment protection usually accorded novels and movies outweighs whatever publicity rights plaintiffs may possess.")

is unclear when courts should apply First Amendment defenses in this arena.

Despite the murky picture, the following guidelines have materialized. Most courts conclude that the "use" of another's identity by a traditional medium such as television, newspapers, magazines or books will be protected by the First Amendment defenses of either "newsworthy" or "incidental use." On the other hand, if a *commercial product* uses the individual's identity for profit, First Amendment protection dissipates.[26] Some courts bypass the "use" analysis and attempt to balance the two interests. As one commentator writes,

> Most courts have focused their analyses of the conflicting doctrines on whether the use of the identity was a purely commercial use or a protected free speech use. The concepts of "commercial" use and protected (or newsworthy) free speech" use, however, present significant problems because no uniform definition of "commercial use" has emerged from the case law ... other courts have resolved conflicts between the two doctrines by balancing the interests protected by the right of publicity against the interests protected by the First Amendment. *Haines, supra.*

In this case, the facts show that Cardtoons has neither a "newsworthiness" or an "incidental use" defense (*i.e.*, the product is *not a* newspaper or magazine or other traditionally protected medium and does not "incidentally" reference the players.) This conclusion rests, in part, on the fact that Cardtoons' overriding purpose is commercial. The company's very use of the players' likenesses is, in fact, the end result—the "product". It desires to *sell the parody.*

The evidence shows that the company's entire marketing and packaging scheme mirrors that of any commercial collectible trad-

ing card companies. Consequently, there is little doubt in the undersigned's mind that "the use of the identity" was for a "purely commercial" purpose.

Despite the "commercial" finding, one issue remains: *Is there a First Amendment "parody" defense for a commercial product under a balancing approach?* Or, put simply, can one *sell* a parody? No case has been found in which a First Amendment "parody" defense was successful as against a "right to publicity" claim.

However, other cases certainly suggest that such a defense is feasible. For example, parodies are generally protected by the First Amendment for non-commercial uses in a traditional medium. In addition, the "parody" defense has been recognized in trademark and copyright infringement cases. Brief overview of those cases is important.

## C. Parody As A First Amendment Defense By Traditional Media.

For the most part, parody in a traditional form such as a political cartoon has always received First Amendment protection.[27] The United States Supreme Court examined the issue when *Hustler Magazine* published a "parody" advertisement featuring the likeness and name of Rev. Jerry Falwell. *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The parody portrayed Falwell and his mother as drunk and immoral, suggesting that the reverend was a hypocrite who preaches only when drunk. The advertisement prompted Falwell to sue *Hustler* for invasion of privacy, libel, and intentional infliction of emotional distress.

Falwell argued that the State's interest in protecting public figures from emotional distress overrides First Amendment protection

---

**26.** In *Paulsen,* while *posters* were *sold,* the court found that *the activity* (not just the publication) was to be protected as *political* speech, albeit in a commercial context. *Paulsen* is an anomalous result in this sense.

**27.** The *American Heritage Dictionary* defines "parody" as "the literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule." The Oxford English Dictionary describes the term as "a composition

in which the characteristic turns of thought and phrase of an author are mimicked to appear ridiculous, especially by applying them to ludicrously inappropriate subjects." Parody also dates back as far as Greek antiquity; done historically by persons such as Chaucer, Shakespeare, Voltaire, Hemingway and Faulkner. *See, generally, L.L. Bean v. Drake Publishers, Inc.,* 811 F.2d 26, 27 (1st Cir.1987).

to speech that was patently offensive and intended to inflict emotional injury. The Supreme Court rejected that argument:

> Were we to hold otherwise, there can be little doubt that political cartoonists and satirists would be subjected to damages awards without any showing that their work falsely defamed its subject. Webster's defines a caricature as the deliberate distorted picturing or imitating of a person, literary style, etc. by exaggerating features or mannerisms for satirical effect.' ... The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often calculated to injure the feelings of the subject of the portrayal. *Id.* at 53–54, 108 S.Ct. at 881.

The Court acknowledged that First Amendment protection is limited in cases involving obscenity and "fighting words" and recognized "that not all speech is of equal First Amendment importance." *Id.* at 56, 108 S.Ct. at 882. It concluded, however, that "the publication of a caricature such as the ad parody" was protected by the First Amendment. *Id.* at 57, 108 S.Ct. at 883.

While *Hustler* recognized a First Amendment protection for a "parody" advertisement in a magazine (i.e. traditional medium). It did not address the question of whether First Amendment parody protection should extend beyond the "traditional" or "non-commercial" medium. Consequently, other courts have grappled with the issue in commercial settings, especially in the areas of trademark and copyright.

### D. Parody As a Final Amendment Defense in Trademark Cases

The trademark issue analogous to a "right of publicity" right case stems from the Lanham Act, which prohibits the unauthorized use of a reproduction, copy, or imitation of a registered trademark in a way that "is likely to cause confusion" with the registered mark. 15 U.S.C. § 1114(1)(a).[28] Such confusion occurs when consumers make an "incorrect mental association between the involved commercial products or their producers." *San Francisco Arts & Athletics Inc. v. United States Olympic Committee,* 483 U.S. 522, 107 S.Ct. 2971, 2995, 97 L.Ed.2d 427 (1987) (Brennan, J. dissenting). Also, see, generally *Jordache Enterprises Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1483 (10th Cir.1987).

Nearly every court dealing with a Lanham Act claim involving a parody struggles with the First Amendment implications. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2nd Cir. 1979), the Court found little First Amendment protection. "Trademark is a property right," the court wrote, "[and] it need not yield to the ... First Amendment ... under circumstances where adequate alternative avenues of communication exists." But most courts have adopted something akin to a balancing test. *See, Girl Scouts v. Bantam Doubleday,* 808 F.Supp. 1112, 1118 (S.D.N.Y. 1992) ("The owner of a trademark does not possess a property right that is superior to the First Amendment right accorded to artistic expression").

For example, in *Rogers v. Grimaldi,* 875 F.2d 994, 997 (2nd Cir.1989), actress Ginger Rogers filed a Lanham Act claim against the producers of the film "Ginger and Fred." The movie was not about Ginger Rogers, but featured two Italian cabaret performers who imitated Ginger Rogers and Fred Astaire. Ginger Rogers contended the title of the film created the impression that she was the subject of the film or had endorsed it. The court rejected Rogers' claim, finding that "The [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999.

The Second Circuit in *Cliffs Notes v. Bantam Doubleday Dell Publishers Group,* 886 F.2d 490 (2nd Cir.1989) adopted the balancing test used in *Rogers.* The Lanham Act controversy there began when Bantam published *Spy Notes,* a one-time double parody

---

**28.** A growing number of judges and commentators have sought to extend First Amendment protection to noncommercial use of trademarks. *See, Jordache,* supra, footnote 7. But the question here, as in *Jordache,* involves a commercial product.

of *Spy Magazine* and *Cliffs Notes*. *Spy Notes* admittedly copied prominent features of *Cliffs Notes* to make it an effective parody. As a result, prior to its distribution, *Cliffs Notes* filed suit, claiming consumers would think it published *Spy Notes*. The district court enjoined *Spy Notes* from being disseminated.

On appeal, the Second Circuit vacated the injunction. Calling parody a "form of artistic expression protected by the First Amendment", it emphasized that "parody and satire are deserving of substantial freedom—both as entertainment and as a form of social and literary criticism." *Id.* at 493. (citing *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541, 545 (2d Cir.1964.) The court, however, acknowledged that the First Amendment is limited in trademark cases. "Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." *Id., citing Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2nd Cir.1989). Wrote the court:

> Conflict between the two policies is inevitable in the context of parody, because the keystone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border. A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law since the customer will be confused. *Id.* at 494.

In deciding that the First Amendment right to parody outweighed the "public interest in avoiding consumer confusion", the court found that it was unlikely that consumers would confuse *Spy Notes* with *Cliffs Notes*. The courts emphasized that *Spy Notes*, although a parody, differed from *Cliffs Notes* in many ways: different colors on the front and back covers, *Spy Notes* cost twice as much, *Cliffs Notes* summarized the "great books" while *Spy Notes* did not and that *Spy Notes* was plainly marked as a "satire". *Id.* at 496.

The Tenth Circuit addressed the "trademark parody" issue when a New Mexico company began selling designer blue jeans to large women. On the back of the jeans, the company, Oink Inc., identified its jeans with a smiling pig and the word "Lardashe" on the seat of the pants. Jordache Enterprises, Inc. sued, alleging a Lanham Act violation. The district court denied Jordache's "likelihood of confusion" claim, and the Tenth Circuit affirmed. *Jordache Enterprises, Inc.*, 828 F.2d at 1482.

The Tenth Circuit stated that no "likelihood of confusion" existed, in part, because "where a party chooses a mark as a parody of an existing mark, the intent is not necessarily to confuse the public but rather to amuse." *Id.* at 1485. The court explained:

> In one sense, a parody is an attempt to derive benefit from the reputation of the owner of the mark ... if only because no parody could be made without the initial mark. The benefit to the one making the parody, however, arises from humorous association, not from public confusion as to the source of the marks. A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect. *Id.* at 1486.

In denying Jordache's claims, the Tenth Circuit recognized a First Amendment right of parody but also noted that, "where two marks are confusingly similar, or where there is evidence of actual confusion, a likelihood of confusion can exist despite the intent to create a parody." *Id.* at 1486. *See, also, Nike Inc. v. Just Did It*, 6 F.3d 1225 (7th Cir.1993) ("Parody defense enough to overcome summary judgment motion") and *Black Dog Tavern Co. v. Hall*, 823 F.Supp. 48 (D.Mass.1993).

*Jordache* and the other trademark cases do not paint a clear picture of when parodies used in commercial settings should receive First Amendment protection, but three methods of analysis surface. Some courts recognize parody as an affirmative defense to a Lanham Act claim. Others balance the rights of trademark owners against First Amendment concerns. Still other courts hold that "parody is not a defense to trade-

mark infringement, but rather is another factor to be considered in the likelihood of confusion equation." *Schieffelin & Co. v. Jack Co. of Boca,* 725 F.Supp. 1314, 1323 (S.D.N.Y. 1989).[29] No matter the analysis used, most of the cases reviewed by the undersigned suggest that courts seldom allow First Amendment concerns to override the property rights of a trademark owner in a *commercial* setting.[30]

### E. Parody As A First Amendment Defense in Copyright Cases

■ The "parody" analysis in copyright cases is generally treated under the broader concept of "the fair use doctrine". *Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.,* 737 F.Supp. 826 (S.D.N.Y.1990).[31] Whether a particular work qualifies as fair use requires consideration of the following four elements: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market or value of the copyrighted work.

Courts analyzing "parody" issues under copyright law follow approaches similar to that found in trademark and "right to publicity" cases. A *noncommercial* use of a parody is more likely to receive protection than one designed for *commercial* profit. Illustrative is *Tin Pan Apple,* where a commercial for Miller Brewing Co. featured look-a-likes (and sound-a-likes) of the "Fat Boys".[32] The Fat Boys sued for copyright infringement. In analyzing the case, the court noted:

> The alleged ·copyright infringers in *Elsmere [Music, Inc. v. National Broadcasting Co.,* 623 F.2d 252 (2d Cir.1980)] and *Berlin* were a comedy television program and a comic [Mad] magazine: both vehicles for the expression of that creative flow of ideas which the Second Circuit identified in *Warner Brothers [Inc. v. American Broadcasting, Inc.,* 720 F.2d 231 (2d Cir.1983)] as the justification for the parody branch of the fair use doctrine. But there is ample authority for the proposition that appropriation of copyrighted material solely for personal profit, unrelieved by any creative purpose, cannot constitute parody as a· matter of law. *Id.* at 830.

The court in *Tin Pan Apple* also cites *Original Appalachian Artworks v. Topps Chewing Gum,* 642 F.Supp. 1031 (N.D.Ga. 1986). In that case, Topps, a chewing gum manufacturer, began distributing "Garbage Pail Kids" stickers and chewing gum cards. Plaintiff, who marketed "Cabbage Patch

---

**29.** Given the foregoing, and upon close reading of *Jordache, supra,* it appears the Tenth Circuit follows this analysis, treating the parody as another factor in the "likelihood of confusion" decision.

**30.** For example, see, generally, *Chemical Corp. of America v. Anheuser–Busch,* 306 F.2d 433 (5th Cir.1962) (floor wax and insecticide maker's slogan harmed strength of defendant's slogan); *Original Appalachian Artworks, Inc.· v. Topps Chewing Gum,* 642 F.Supp. 1031 (N.D.Ga.1986) (merchandiser of "Garbage Pail Kids" stickers and products injured owner of Cabbage Patch kids mark); *General Electric Co. v. Alumpa Coal Co.,* 205 U.S.P.Q. 1036 (D.Mass.1979) ("General Electric" monogram on underpants and T-shirts harmful to plaintiff's trademark) and *Coca–Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972) (enjoining the merchandise of "Enjoy Cocaine" posters bearing logo similar to plaintiff's mark.) The trademark cases are similar to the "use" analysis in 'right to publicity issues. Unauthorized commercial use of trade-

mark parodies is generally prohibited while trademark parody in a non-commercial, traditional medium is often protected. See, generally, *L.L. Bean,* 811 F.2d at 31.

**31.** Whatever legal meaning parody may have in other contexts ... in copyright law parody forms a part of the broader concept of fair use. Section 101 of the 1976 Copyright Act Revisions, 17 U.S.C. § 107 ... provides in part that the fair use of a copyrighted work ... for purposes such as criticism, comment ... is not an infringement of copyright ... Under the "fair use" doctrine ... courts have allowed the taking of words or phrases when adapted for use as commentary or parody ... The parody branch of the fair use doctrine is itself a means of fostering the creativity protected by the copyright law. It also balances the public interest in the free flow of ideas with the copyright holder's interest in the exclusive use of his work. *Id.* at 828–829.

**32.** A "rap" group.

Kids" brought a copyright action. Topps raised a fair use, parody defense, which was *rejected* by the court because "the primary purpose behind the defendant's parody is *not* an effort to make a *social comment* but is an attempt to make money." *Id.* at 1034.

A third case illustrative of the copyright analysis of parody is *Acuff–Rose Music, Inc. v. Campbell,* 972 F.2d 1429 (6th Cir.1992).[33] The "2 Live Crew", a rap music group, released for commercial distribution a version of Acuff–Rose's copyrighted song "Oh, Pretty Woman". Acuff–Rose sued the group for copyright infringement. The district court granted summary judgment, holding that the "2 Live Crew" had created a parody that was a non-infringing "fair use" of the song. The Sixth Circuit reversed. Part of the analysis focused on the first prong of the "fair use" test:

> In the instant case ... "2 Live Crew's" song is included on a commercially distributed album sold for the purpose of making a profit and that [its] primary goal in releasing 'As Clean As They Wanna Be' is to sell its music ... We agree that commercial purpose is not itself controlling on the issue of fair use, but find the district court placed insufficient emphasis on the command of *Harper & Row [Publishers v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ], wherein the Supreme Court expressly reaffirmed its earlier holding that *every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright* [471 U.S. at 562, 105 S.Ct. at 2231]. *Id.* at 1436–1437. (Emphasis added.)

The court found that the "2 Live Crew" song was *not* "fair use" of the original "Oh, Pretty Woman." Wrote the court: "It is the blatantly commercial purpose of the derivative work that prevents the parody from being a fair use." *Id.* at 1439.

### F. Summary of Decisional "Parody" Defenses

The foregoing analyses, while illustrative and not exhaustive, are nonetheless instructive: First, parodies used in a traditionally non-commercial medium such as a newspaper, magazine, television program, book or movie will likely be granted First Amendment protection. Second, though the issue is not finally resolved, several cases suggest that *non-commercial* parodies of trademarks and copyrights are more likely to receive First Amendment protection than their *commercial* counterparts. Third, trademark parody used in a *commercial* context (i.e. products, goods, etc.) will, as a general rule, *not* receive First Amendment protection. Exceptions to this rule are illustrated, however, by the *Jordache* and *Nike* cases. Lastly, the First Amendment will *not* suffice as a defense where the alleged copyright infringer's parody is *purely commercial.*

In sum, while case law is fluid, trademark and copyright cases generally engage a "balancing" test where the "use" of the parody is given considerable weight (i.e., is it non-commercial or commercial? Traditional medium or commercial product?). Such an approach, interestingly enough, is quite similar to the "right to publicity" cases.

### G. Does Cardtoons Have a "Parody" Defense?

In the final analysis, the question is whether Cardtoons, undeniably having created an attractive and appealing product, can claim First Amendment protection for its "*Baseball Parody Cards*" as a "parody". The answer, reached upon analysis under either a "use" or, "balancing" test, is the same. Each is discussed below.

#### (1) "Use" Analysis

If anything is plain in this case, "the primary purpose behind the Defendant's parody is not an effort to make a social comment but is an attempt to make money". Its purpose is to parody the marquee names and likenesses of Major League Baseball in order to

---

**33.** The Supreme Court has granted certiorari in this case. *Campbell v. Acuff–Rose,* —— U.S. ——, 113 S.Ct. 1642, 123 L.Ed.2d 264 (1993).

sell its "trading cards." [34] Cardtoons' marketing scheme is virtually identical to that of other baseball trading card companies and, in effect, is no different. Cardtoons' "parody cards" are a commercial "product" such as has historically received little First Amendment protection.

The cards do *not* take the form of or make use of a traditional medium, such as a newspaper, magazine, book, film or television program. Such forums have traditionally been afforded significant First Amendment protection. Not so with commercial products. Given the evidence in this case, Cardtoons' *"Baseball Parody Cards"* are commercial products, not traditional media.

### (2) The "Balancing" Analysis

Parody and satire are deserving of "substantial freedom—both as entertainment and as a form of social and literacy criterion." *Berlin v. E.C. Publications*, 329 F.2d 541, 545 (1964). In addition, "a court must be ever mindful of the inherent tension between the protection of an individual's right to control the use of his likeness and the constitutional guarantee of free dissemination of ideas, images and newsworthy matter in whatever form it takes." *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 88 (1989).

In this case, Cardtoons' "right to parody" focuses on Major League Baseball. Baseball, as "America's pastime", is without doubt, newsworthy. Its players, especially the ones featured by Cardtoons, are well-known public figures. In addition, Cardtoons' "parody" cards are entertaining, humorous, and stimulate discussion about national issues facing professional baseball (e.g., skyrocketing salaries).

However, as first discussed in *Haelan* and affirmed by every court since, a professional baseball player has a "valuable property

right in his name, photograph and image and . . . he may sell these property rights." *Cepeda v. Swift*, 415 F.2d 1205, 1206 (8th Cir.1969). Such a right, codified by the Oklahoma legislature, exists for three reasons:

(1) Recognizing the economic value of an individual's identity;

(2) Acting as an incentive for creativity by encouraging the production of entertaining and intellectual works; and

(3) Preventing unjust enrichment of those who usurp the identity of another.

In this case, allowing Cardtoons to profit from the "economic value" of the MLBPA players without returning just compensation is *contra* the plain meaning of the Oklahoma statute; and ultimately, the policies which accord a cause of action in support of the "right of publicity."

■ Cardtoons' "expression" or "speech" is *commercial*. The Constitution "accords a lesser protection to commercial speech than to other constitutional guarantees of expression." *Central Hudson v. Public Service Commission*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). While a company "enjoys the full panoply of First Amendment protection for its direct comments on public issues, there is no rationale for providing similar constitutional protection when such statements are made only in the context of commercial transactions." *Id.* at 563, n. 5, 100 S.Ct. at 2349, n. 5. Cardtoons' commercial speech is, in essence, a product—a fact serving to further water down its First Amendment right to parody.[35] That is, it seeks to *sell* the very thing it now calls "speech". Balancing Cardtoons' right to publish and sell its product versus the players' rights of publicity on the fulcrum of the First Amendment finds the scales weigh-

---

34. Secondarily, it can also be said that Cardtoons seeks to "parody" the traditional "baseball card" product itself.

35. Another factor that must be weighed are the ramifications of a decision allowing Cardtoons a First Amendment defense in this case. Selling "commercial" parodies of baseball players would obviously lead to doing the same thing for other professional sports and entertainment. In addi-

tion, allowing "parody" collectible trading cards would open the door to virtually any commercial product. Opening that floodgate is neither a good nor logical idea, in the context of an evolving pattern of cases which clearly recognize the *on-going* tension between the First Amendment and property interests, such as the "right of publicity".

ing in favor of the players. If profit is to be derived from the endeavor, it properly belongs to the players, not Cardtoons' for it is the players likeness and fame which brings the profit.

### H. Summary

For purposes of declaratory judgment, the bottom line is this: Cardtoons has the First Amendment right to "parody" Major League Baseball players in a *non-commercial* venue. It could simply disseminate the cards without charge or, with a few minor revisions, Cardtoons could parody the sport (and its players) in a traditional forum such as a book or magazine. It could even do so in its present form (cards) if the players' "likenesses" were not evident. First Amendment rights end, however, when Cardtoons preys on the MLBPA's names and likenesses for purely commercial purposes. Indeed, the singular reason for using the players' likenesses and/or names is to entice the consumer to purchase the product. Without such likenesses and names, the profit potential dwindles. As one court aptly said:

Let the word go for there is no free ride— the commercial hitchhiker seeking to travel on the fame of another will have to learn to pay the fare or stand on his own two feet. *Onassis v. Christian Dior*, 122 Misc.2d 603, 472 N.Y.S.2d 254, 261 (N.Y. 1984).

## V. THE PRELIMINARY INJUNCTION

As regards the remedy sought by the MLBPA for preliminary injunction the undersigned finds as follows.

To obtain a preliminary injunction, MLBPA—the moving party—must establish: (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

The foregoing analysis indicates that MLBPA has established a substantial likelihood of prevailing on the merits. Therefore, the undersigned turns his attention to the second element. Will MLBPA suffer "irreparable harm" unless such an injunction is issued?

 Irreparable harm is defined as "harm that cannot be prevented or fully rectified by the final judgment of a trial court." *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir.1984). It also has been described as "harm that cannot be repaired." *Young v. Ballis*, 762 F.Supp. 823, 827 (S.D.Ind.1990). Furthermore, "where money damages is adequate compensation, a preliminary injunction will not issue." *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp. 848, 854 (S.D.N.Y.1991). *See also, Young, supra* ("Clearly when only money is at stake, there can be no irreparable injury.") The Seventh Circuit further states:

In every case in which the plaintiff wants a preliminary injunction he must show that he has "no adequate remedy at law," ... that he will suffer "irreparable harm" if the preliminary injunction is not granted. *The absence of an adequate remedy at law is a precondition to any form of equitable relief.* The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of the trial to get that relief. Only if he will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction. *Roland*, 749 F.2d at 386.

 In this case, MLBPA has not shown that irreparable harm will occur if an injunction does not issue. Of particular import is MLBPA's lack of showing any type of irreparable harm beyond a general allegation that the "image" of baseball players *might be* tarnished. *See, C & A Carbone, supra,* ("The importance of movant of demonstrating clearly and convincing exactly why money damages are inadequate cannot be overstated.") In addition, MLBPA's claim of ir-

reparable harm is without merit because there is an adequate remedy at law, i.e., the exact Oklahoma Statute now at issue. If Cardtoons sells its trading cards, it must compensate MLBPA under the terms of 12 O.S. § 1449. Oklahoma's "right to publicity" statute is intended to *compensate* persons such as the MLBPA members for using their likeness.[36] The statute reads, in-part: A party "shall be liable *for any damages* sustained by the person or persons injured as a result thereof, and *any profits from the unauthorized use that are attributable to the use* shall be taken into account in computing the actual damages." *(Emphasis added).* Therefore, the harm suffered by MLBPA is fully able to be rectified through the provisions of the statute. Consequently, the Magistrate recommends the preliminary injunction be denied.

## VI. CONCLUSION

Cardtoons, L.C. has created a unique product, superlative in its presentation. The artwork is of high quality. The cards are humorous and clearly, in this writer's opinion, achieve their stated goal to parody certain Major League Baseball players.

However, in creating its imagery Cardtoons has squarely framed the question whether it can, without license from or compensation to the Major League Baseball Players Association, parody the players and *sell* the parody. In so doing, it has placed itself precisely between the players' "right of publicity" and First Amendment rights of free expression. The resultant tension must be balanced, taking into account the competing interests of the respective parties.

Two factors are decisive in the final analysis of Cardtoons' endeavor. First, its *"Baseball Parody Cards"*, is a commercial product. Second, the cards contain the "likenesses" of active Major League Baseball Players.

Cardtoons seeks to sell its product, already having engaged in preliminary marketing activities of the same quality and character as would be expected of any other like commer-

cial enterprise. Its efforts, even in its infancy, have been national in scope. The composition of its *"Baseball Parody Cards"*, while arguably created to parody the very trade (*i.e.*, "baseball cards") upon which it now seeks to capitalize, instead lends itself to commercial sale. "Chase cards", "subsets" and unique inserts within the collection all lead to the conclusion that this is a commercial endeavor designed to capture a market share of the sports card (or even "non-sports" card, depending upon how the terms are defined) marketplace.

The inescapable conclusion is that Cardtoons' *"Baseball Parody Cards"* is a commercial product whose creation, portraying the "marquee" players of Major League Baseball, is designed to make money for the Company and its investors. This being the *factum probandum* of the litigation, the undersigned finds it has been proven.

Resolving the resultant legal tension between Cardtoons and the Major League Baseball Players Association thus depends upon the court's finding that Cardtoons' *"Baseball Parody Cards"* is a commercial product portraying the likenesses of Major League players. Commercial products are deserving of *less* protection under the First Amendment than non-commercial products. Balancing both parties' interests upon the dual fulcrums of the First Amendment and the players' "rights of publicity", the scales tip to the players, Cardtoons' First Amendment free expression yielding to individual rights of publicity in the contexture of a commercial undertaking. Where as here, the goal is primarily commercial, resolution of the legal tension must also be commercial.

Cardtoons seeks to *profit* by marketing parodies of players, well known and followed by the American public. The players' "right of publicity" protects this very recognition. It is, in fact, the heart of the right. Cardtoons cannot expect to make money by trading on the likenesses and name recognition of lauded national figures and avoid application of the law which vests in those same individu-

---

**36.** As discussed earlier, the right to publicity recognizes three concerns: (1) the economic value of an individual's identity; (2) the incentive for creativity by encouraging the production of entertaining and intellectual works; and (3) prevention of unjust enrichment of those who usurp the identity of another.

als the right to protect the commercialization of their names, likenesses and reputations. Shakespeare said it best—*those who live by the sword, die by the sword.* Having leapt into the commercial environment, Cardtoons must now live by its rules; and while free expression must be given its due, its scope is limited by marketplace constraints.

The United States Magistrate Judge, therefore, makes the following recommendations:

1. That the trial of this matter be consolidated with hearings held, in accord with Rule 65(e), *Federal Rules of Civil Procedure.* The facts are straightforward. Further hearing will in no wise aid or assist the court.

2. That declaratory judgment be entered in favor of the Major League Baseball Players Association, to the effect that Cardtoons' seventy-one (71) players, twenty (20) Big Bang Buck and ten (10) Spectra cards, part of its *"Baseball Parody Cards"* set which depict the likenesses and parody names of active Major League Baseball players violates 12 O.S. § 1449(A) and the players' "rights of publicity", as embodied within that statute.[37]

3. That declaratory judgment be denied to Cardtoons, to the effect that it does *not* have a First Amendment right of free expression to market and sell its *"Baseball Parody Cards"* without license from the Major League Baseball Players Association.

4. That injunctive relief be denied to the Major League Baseball Players' Association, there being no showing of "irreparable harm"; and, the MLBPA having an otherwise adequate remedy at law.

5. That damages be denied to both parties, the evidence showing that no sales of the *"Baseball Parody Cards"* have been made.[38]

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of the receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[39]

Dated this 3rd day of November, 1993.

## JOINT STIPULATION OF FACTS

September 14, 1993

The plaintiff, Cardtoons, Inc., L.C. ("Cardtoons") and the defendant, Major League Baseball Players Association ("MLBPA") jointly stipulate to the following facts for purposes of proceedings conducted in the captioned matter.

1. Cardtoons is an Oklahoma Limited Liability Company having its principal place of business at 7700 E. 42nd Place, Tulsa, Oklahoma. James L. Fromm ("Fromm") is the president and general manager of Cardtoons.

2. MLBPA is an unincorporated association which serves as the exclusive collective bargaining agent under the Labor Management Relations Act for all Major League baseball players with respect to the terms and conditions of their employment with professional baseball clubs. In addition, by virtue of various forms of written commercial authorization agreements dating from 1966 to the present, MLBPA has acted as the assignee of group rights granted to it by such of its members as wish to do so, in connection with, among other things, the use of their names, nicknames, signatures, biographical information and likenesses, for commercial or publicity purposes, including without limitation all products and product

---

37. This includes any other type of card within the set depicting a player's likenesses and parody name. It does *not* include the cards drawn by Dave Simpson, which do not depict players' likenesses, and which the MLBPA agrees, may be published. Nor does it technically include *former* Major League Players, whose interests are admittedly *not* protected by the MLBPA. The same analysis, however, would clearly apply to such persons, on an individual basis.

38. Part and parcel of this recommendation is that the MLBPA be granted declaratory judgment on Cardtoons' claim for "interference with contractual relations".

39. See *Moore v. United States of America,* 950 F.2d 656 (10th Cir.1991).

lines featuring three (3) or more Major League baseball players.

3. Cardtoons was organized for the purpose of manufacturing, advertising, distributing, and selling trading cards known as the "Cardtoons Baseball Parody Cards" ("Cardtoons Cards").

4. On or about January 26, 1993, Cardtoons entered into an agreement with Dave Simpson ("Simpson"), a copy of which is marked as *Joint Exhibit No. 11.*

5. On or about January 26, 1993, Cardtoons entered into an agreement with Mike Sowell ("Sowell"), a copy of which is marked as *Joint Exhibit No. 10.*

6. On or about January 26, 1993, Cardtoons entered into an agreement with Dayne Dudley ("Dudley"), a copy of which is marked as *Joint Exhibit No. 9.*

7. On or about January 26, 1993, Cardtoons entered into an agreement with Monarch Investments, Inc. ("Monarch") and John D. Graves ("Graves"), a copy of which is marked as *Joint Exhibit No. 8.*

8. The artwork for the Cardtoons Cards was drawn by Dudley and Simpson, and the textual material was written by Sowell, with input and approval by Fromm.

9. The entire set of Cardtoons Cards consists of 130 cards, including several different types of cards:

 (a) 71 active player cards;

 (b) 10 retired player cards;

 (c) 1 checklist card;

 (d) 11 Politics in Baseball cards;

 (e) 10 Spectra Cards;

 (f) 20 Big Bang Bucks cards; and

 (g) 7 Standing Cards.

*Joint Exhibit No. 7* constitutes an album containing photographic proofs of the 130 cards comprising the entire set of Cardtoons Cards). The reverse side of each card also bears the Cardtoons logo, and the following language:

> *Cardtoons baseball is a parody and is NOT licensed by Major League Baseball Properties or Major League Baseball Players Association.*

MLBPA asserts no claims in this action regarding either the 11 Politics in Baseball cards or the 7 Standing Cards.

10. Cardtoons neither sought nor obtained the authorization or approval of MLBPA or any of its members to produce, promote, distribute, and/or sell the Cardtoons Cards.

11. Cardtoons selected Champs Marketing, Inc. ("Champs"), in Cleveland, Ohio to print the Cardtoons Baseball Parody Cards.

12. Cardtoons conducted a direct mail advertising program for the Cardtoons Cards directed primarily to hobby dealers. The direct mail program provided for the mailing of an information packet to hobby dealers which contained:

 (a) three (3) promotional cards;

 (b) a 21″ by 14″ poster displaying the Cardtoons logo, artwork from six (6) sample cards, and a description of the Cardtoons Baseball Parody Cards;

 (c) a one page "Hobby Retail Fact Sheet";

 (d) a two sided glossy advertisement, with a checklist on one side, and photographs of the cards and packaging, with descriptive text on the other side;

 (e) an order blank; and

 (f) a self addressed return envelope.

*Joint Exhibit 13* constitutes one of the information packets which Cardtoons sent to hobby dealers.

13. Cardtoons also conducted a commercial advertising campaign for the Cardtoons Cards. Advertisements were placed in the following periodicals: Nonsports Update, Comic Retailer, Comic Scene, Diamond Comics, Comic Buyers Guide, Tuff Stuff, Sports Collectors Digest, Baseball Card and Hobby. The following Joint Exhibits constitute examples of advertising placed by Cardtoons in the following publications:

> *Joint Exhibit 26* Sports Collectors Digest (March 19, 1993)

> *Joint Exhibit 28* Wizard (August, 1993)

> *Joint Exhibit 59* Previews (May, 1993)

> *Joint Exhibit 60* Advance Comics (July, 1993)

*Joint Exhibit 61* Comics Retailer (July, 1993)

*Joint Exhibit 70* Tuff Stuff (August, 1993)

*Joint Exhibit 71* Comics Scene (July, 1993)

*Joint Exhibit 72* Wizard (July, 1993)

*Joint Exhibit 73* Sports Collectors Digest (July 30, 1993)

*Joint Exhibit 74* Sports Collectors Digest Non–Sport & Entertainment Card Insert (July 2, 1993)

*Joint Exhibit 80* Non–Sport Update (3rd Quarter, 1993)

14. Cardtoons entered into an exclusive distribution agreement with TCM Associates, Inc. ("TCM") whereby Cardtoons granted TCM the exclusive right to market the Cardtoons Cards through its representatives and other brokers to convenience stores, candy and tobacco distributors, grocery wholesalers & co-ops, supermarket chains, drug chains, variety chains, toy stores, periodical distributors, club stores (chains & independents), and special markets on a commission basis.

15. Every current Major League baseball player has executed a commercial authorization agreement with the MLBPA covering all periods relevant to the instant motion. *Joint Exhibit 48* constitutes a sample commercial authorization agreement.

16. MLBPA's group licensing program originated in 1966, when the MLBPA licensed Coca Cola to place player pictures on the underside of bottle caps in connection with promoting the sale of soft drinks. The group licensing program expanded during the 1970's with the MLBPA entering into group licensing arrangements in connection with candy, cookies, cereals and other products, including baseball cards. In each case, the licensees were authorized to use Major League players' names and likenesses on or in connection with a product or service, and paid a promotion fee and/or royalties to the MLBPA. Revenues from this group licensing program have been distributed to Major League players in accordance with policies established by the MLBPA Executive Board.

17. The MLBPA first involved itself in baseball trading cards in 1968. There are currently six (6) companies authorized for manufacture and retail distribution of baseball trading cards bearing the names, likenesses, signatures and statistical information of Major League baseball players. Those licensees market their products under the brand names TOPPS, FLEER, SCORE, UPPERDECK, LEAF/DONRUSS, and PACIFIC. Additionally, the MLBPA has granted two (2) limited licenses authorizing retail distribution of baseball trading cards in 1993. *Joint Exhibits 52 & 65* are looseleaf binders containing examples of some 1993 baseball cards produced by the above named licensees:

*Joint Exhibit 52* Looseleaf Binder containing examples of some 1993 Baseball Cards:

p. 1 Upper Deck

p. 2 Score

p. 3 Score Select

p. 4 Score Pinnacle

p. 5 Fleer

p. 6 Fleer Ultra

p. 7 Donruss

p. 8 Leaf

p. 9 Leaf Studio

p. 10 Topps

p. 11 Topps Stadium Club

p. 12 Pacific Spanish

*Joint Exhibit 65* Looseleaf binder containing 1993 Upper Deck Fun Pack cards

18. On several occasions dating back as early as 1970, the MLBPA has taken steps to enforce its rights and the publicity rights of its members against persons who have infringed upon the MLBPA's group licensing rights by producing or selling non-licensed baseball cards, games or other products.

19. MLBPA learned of the Cardtoons Baseball Parody Trading Cards after seeing an advertisement for the Cardtoons Baseball Parody Cards which appeared in the May 14, 1993 issue of Sports Collectors Digest.

20. On June 18, 1993, Dennis Palmer, counsel for MLBPA, sent a letter to Cardtoons. *Joint Exhibit 81* constitutes a copy of this letter.

**1526**

21. On June 18, 1993, Dennis Palmer, counsel for MLBPA, sent a letter to Champs Marketing. *Joint Exhibit 82* constitutes a copy of this letter.

22. Cardtoons commenced this action on June 22, 1993.